# Richmond

## City of Richmond v. Dr. Russell E. Randall, Jr., Et Al.

January 20, 1975.

Record No. 740207.

Present, I'Anson, C.J., Carrico, Harrison, Cochran and Poff, JJ.

*Henry M. Jarvis, Assistant City Attorney for the City of Richmond (Conard B. Mattox, Jr., City Attorney for the City of Richmond,* on brief), for plaintiff in error.

*J. W. Keith, Jr. (Keith & Inge,* on brief), for defendants in error.

*Robert L. Dolbeare; Obenshain, Hinnant, Dolbeare & Beale,* for Southampton Citizens Association, et al., *amici curiae.*

Poff, J., delivered the opinion of the court.

Dr. Russell E. Randall, Jr., and J. W. Keith (landowners) filed a motion for declaratory judgment against City of Richmond (City) asking the chancellor to declare that "(1) the R-2 (single family residence on minimum 12,500 square foot lot) zoning classification as it applies to their 3.24 acres of vacant land . . . is invalid; (2) the refusal . . . to grant their Special Use request . . . is unreasonable, arbitrary and capricious; and (3) the Court order the City Council to issue the Special Use permit . . . ." By letter opinion dated October 12, 1973, and final decree entered November 9, 1973, the chancellor made extensive findings of fact and ruled, *inter alia,* that the "existing ordinance . . . in its application to Plaintiffs' property is unreasonable and confiscatory and therefore unconstitutional"; that since "the unchallenged *evidence* before Council established that Council's action [denying the special use permit] would result in completely depriving the plaintiffs of the beneficial use of their property by precluding all practical uses, Council's action was unreasonable, confiscatory and arbitrary" and "bears no substantial relationship . . . [to] the public health, safety, morals or general welfare"; and that "Council of the City of Richmond within thirty (30) days from the entry of this Decree shall either adopt Ordinance 73-112 [granting the special use permit] or rezone the land to a zoning category which will permit construction of the proposed building and its use for medical and general office purposes." On City's appeal we granted the motion made by Southampton Citizens Association, for itself and certain others, to intervene and file a brief as *amici curiae.*

Landowners made a motion to dismiss the appeal "on the ground that defendant did not comply with Rule 5:9(c) as appears from the trial judge's refusal to certify 'Statement of Facts Pursuant to Rule 5:9'". The Statement of Facts tendered to the chancellor is essentially a summary of data contained in papers included in the record on appeal under Rule 5:8, including admissions under Rule 4:11, exhibits requested under Rule 4:9,

the chancellor's letter opinion, and the final decree. Since we find that record sufficient for the adjudication of the issues presented, we overrule landowners' motion. *See Smyth* v. *Midgett*, 199 Va. 727, 101 S.E.2d 575 (1958).

The 3.24 acre tract, consisting of two adjacent parcels owned separately by landowners, fronts 362 feet on the north side of Forest Hill Avenue beginning at a point 281 feet east of Kenmore Road. With a western boundary of 340 feet and an eastern boundary of 572 feet, its configuration is irregular. Across Forest Hill Avenue to the south is a large apartment complex. On the west, the land is vacant and wooded. On the northwest is a parcel of wooded land some 200 feet wide which, once landlocked, was conveyed to the owners of contiguous single-family lots to serve as a "buffer" between them and the 3.24 acre tract. Immediately to the east along Forest Hill Avenue is a small office building, and approximately 100 feet to the east across Grantwood Road is the western terminus of a "strip-commercial" heavily developed for retail and service uses.

In 1970 when this area was annexed by City, the district in which landowners' property lies was zoned R-2. On April 26, 1971, City adopted a Master Plan which designated for so-called "transitional" use a strip 225 feet wide running in a westerly direction along the north side of Forest Hill Avenue from Grantwood Road to Lansdale Road. This strip traverses the front portion of landowners' property. Pursuant to Rule 4:11, City admits that "the 'transitional' zoning category is used to describe land that will not be developed for single family homes, but should be developed for apartments, offices or generally quiet business purposes." To effectuate this "transitional" concept, the proposed zoning ordinance drafted to implement the Master Plan provides a new classification identified as RO-1 (Residential-Office District).

In October, 1972, before Keith acquired the 2.24 acre parcel, landowners sought to have Randall's one-acre parcel rezoned from R-2 to C-1 (Limited Commercial District) to permit construction of a three-story building for medical and general office purposes. Because the C-1 classification permitted certain other uses deemed unsuited to the area, the City Planning Commission assured landowners that if they would withdraw their application, modify their plans to conform to the requirements of the RO-1 classification, and request a special

use permit, the Commission would waive payment of a second filing fee and sponsor an ordinance granting the permit.[1]

On May 9, 1973, after Keith had acquired the adjacent parcel, landowners filed their application for a special use permit to construct a cluster of three office buildings, including a one-story building and two, two-story buildings. As agreed, the Commission sponsored Ordinance 73-112, and as required by City's charter, the ordinance was referred for study to the Commission's staff. In its report to the Commission, the staff found that the proposed project "would comply with the new RO-1 regulations in every respect (height, setbacks, screening, maximum floor area, etc.)"; that the project "would aid in protecting the area from further strip commercial development west of Grentwood Road"; that by reason of RO-1 screening requirements, the "buffer" area, and the separation distance involved, the project would not "result in an appreciable adverse impact on nearby residences"; that the project would generate "less than 400 vehicle trips per day" and such volume "would not constitute a substantial increase in traffic over the current volume which is in excess of 12,500 vehicles per day"; that while the property is deeper than the 225 feet depth of the "transitional" strip fixed in the Master Plan, "the additional depth . . . enables substantial setback from Forest Hill Avenue and the retention of a wooded area to lessen the visual impact of the development from the street"; and that while "it would be possible" by cul-de-sac subdivision to develop the property for residential use, "a less than desirable subdivision pattern would result with awkward orientations of the new lots to the rear of some existing lots" and "such a scheme would necessitate the resubdivision of three existing undeveloped lots and two developed lots" and require the "cooperation of at least six different property owners . . . to assemble adequate land." The staff report recommended that the Commission approve Ordinance 73-112.

On July 2, 1973, with one member abstaining, the Planning Commission voted unanimously to recommend disapproval and mailed City Council a copy of the minutes of its meeting.

---

[1] Under City's charter, action on special use applications is a legislative function of City Council initiated by introduction of a formal ordinance.

Summarizing the data in the staff report, those minutes conclude as follows:

"A petition signed by 232 concerned property owners and residents of the neighborhood was presented to the Commission. The primary concerns were with the excessive setback of the proposed medical complex and the potential threat of undeveloped land in the area being used for commercial development, thereby destroying their residential environment. The members considered the citizens' opposition well-founded and voted to recommend disapproval of the ordinance."

On July 9, 1973, City Council held a public hearing on Ordinance 73-112. In addition to the data in the staff report, Council considered the testimony of several witnesses. M. Howell Watson, a real estate appraiser with 21 years' experience, testified that the area east of landowners' property had experienced "fantastic" commercial development since the 1970 annexation; that part of this development was closer to the homes of complaining residents than landowners' property; that the values of nearby homes would not be adversely affected by the proposed project; and that landowners' property is not suited for single-family residences and no buyer would purchase it for such purpose. Howell was the only expert witness before Council. Counsel for the *amici curiae* and three neighborhood homeowners expressed opinions that the proposed project would destroy the "residential character" of the community; that additional traffic and noise would result; that "the frequency of accidents is increasing in the neighborhood"; and that commercial development beyond the "transitional" use line would set a precedent for future commercial encroachments upon undeveloped land in the area.

With one member absent and one member abstaining, City Council voted unanimously to reject Ordinance 73-112.

City's multiple assignments of error raise three controlling questions, *viz.*, whether the chancellor erred in ruling that, as applied to landowners' property, the existing R-2 zoning ordinance is unreasonable and invalid; whether the chancellor erred in ruling that City Council's denial of the special use permit was unreasonable and invalid; and whether the

chancellor usurped the legislative function in his instructions to City Council upon remand.

The presumption of legislative validity attaches to zoning ordinances, and "if the reasonableness of a zoning ordinance is fairly debatable it must be sustained." *Board of Supervisors* v. *Carper*, 200 Va. 653, 660, 107 S.E.2d 390, 395 (1959). But the presumption of reasonableness inherent in the presumption of legislative validity is not absolute.

> "Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness. If evidence of reasonableness is sufficient to make the question fairly debatable, the ordinance 'must be sustained'. If not, the evidence of unreasonableness defeats the presumption of reasonableness and the ordinance cannot be sustained." *Fairfax County* v. *Snell Corp.*, 214 Va. 655, 659, 202 S.E.2d 889, 893 (1974).

The presumption of legislative validity attaches not only to zoning ordinances adopted by legislative bodies, but also to actions on applications for special use permits where legislative bodies are empowered by law to take such actions.[2] And here, too, the linchpin of the presumption is reasonableness. When a landowner whose special use permit has been denied shows that the existing zoning ordinance, as applied to his land, is invalid, and that the use he requested is reasonable, he has made a *prima facie* showing that the legislative action denying his permit was unreasonable. The burden then shifts to the legislative body to produce evidence showing that the denial was reasonable. If evidence of reasonableness is sufficient to make the question fairly debatable, the legislative denial must be sustained. If not, it cannot be sustained.

With respect to the existing R-2 zoning ordinance, as applied to landowners' property, landowners produced evidence that it is unreasonable; and since we are of opinion that City's evidence outlined above was insufficient to make reasonableness fairly

---

[2] "The exercise of such power [to grant special use permits] is one in which the legislative body exercises judgment or discretion which is reviewable as to reasonableness, *i.e.*, whether there has been illegality, arbitrariness or an abuse of discretion." 2 A. Rathkopf, *The Law of Zoning and Planning* 63-7 (1972).

debatable, we hold that the chancellor did not err in his adjudication of invalidity.

With respect to the special use requested, landowners' evidence, including expert testimony and the findings of experts on the Planning Commission staff, showed reasonableness; since we believe City's evidence, essentially opinion testimony of lay witnesses, was insufficient to make reasonableness of the requested use fairly debatable, landowners made a *prima facie* showing that the legislative denial of their permit was unreasonable; and since we believe City's evidence was insufficient to make the reasonableness of that denial fairly debatable, we hold that the chancellor did not err in his adjudication that such denial bore no substantial relationship to the public health, safety, morals or general welfare and was unreasonable and invalid.

■ Having made these two adjudications of invalidity, the chancellor proceeded to determine what definitive relief would be appropriate. It was apparent that entry of a simple adjudicatory decree granting no definitive relief would work a legal absurdity; the governing body might be left with an island of unzoned land, and the landowners might be left free to put their land to any use, short of a nuisance, they saw fit. Left in that posture, the governing body would be constrained to act hurriedly to zone the unzoned island to a new category. In the rush, and absent definitive guidelines from the court, it might select a category that did not allow the one use shown by the record to be reasonable. In such case, new litigation would ensue. If the new court decree declared the new category unreasonable but again granted no definitive relief, the process of re-zoning and re-litigation could continue *ad infinitum.* The law eschews multiplicity of litigation. When the property rights of an individual and the interests of the community collide, the conflict must be resolved. To expedite a full and final resolution, a court confronted with the conflict must have the power not only to adjudicate the dispute but also to order action not inconsistent with its adjudication.

In the exercise of its power to order such action, a court may not usurp the legislative prerogative. "Zoning is properly a legislative function" and "this court will not substitute its judgment for that of the Board . . . ." *Boggs v. Board of Su-*

*pervisors*, 211 Va. 488, 492, 178 S.E.2d 508, 511 (1971). But when the evidence shows that the existing zoning ordinance is invalid and the requested use reasonable, and when, as here, the legislative body produces no evidence that an alternative reasonable use exists, then no legislative options exist and a court decree enjoining the legislative body from taking any action which would disallow the one use shown to be reasonable is not judicial usurpation of the legislative prerogative.[3]

This Court has no power to re-zone land to any classification or to order a legislative body to do so. *See Board of Supervisors v. Allman*, 215 Va. 434, 211 S.E.2d 48 (1975), this day decided. It follows that trial courts have no such power.

Nor does this Court or any court have power, even when it finds the existing zoning ordinance invalid and a requested use reasonable, to order approval of a special use permit, where, as here, a legislative body is vested by law with jurisdiction over such permits, including legislative discretion to amend the permit ordinance and impose conditions upon the use requested.[4] The power to amend is part of the legislative prerogative.

Here, the chancellor ordered City Council to either enact a new zoning classification for the property which would allow construction of "the proposed building", or to enact Ordinance 73-112, the specific permit ordinance proposed. The order restricts Council to two alternatives. As to the first, the order transgresses the legislative prerogative. As to the second, by foreclosing Council's right under its charter to amend the permit

---

[3] Courts in Illinois have held that a court has power to grant a requested use after it has found the existing zoning ordinance void and the requested use reasonable. *See First Nat'l Bank* v. *Village of Northbrook*, 278 N.E.2d 533, 537 (Ill. App. 1971); *LaSalle Nat'l Bank* v. *City of Chicago*, 264 N.E.2d 799, 801-2 (Ill. App. 1970); *Sinclair Pipe Line Co.* v. *Village of Richton Park*, 167 N.E.2d 406, 411 (Ill. 1960). We believe these holdings, which compel affirmative action by legislative bodies, go too far. The injunction is a more traditional remedy and one less offensive to the concept of separation of powers. Concerning use of an injunction as definitive relief in resolving land use disputes, see *City of South Miami* v. *Martin Bros., Inc.*, 222 So.2d 775, 777 (Fla. App. 1969); *City of Miami Beach* v. *Weiss*, 217 So.2d 836, 837 (Fla. 1969)

[4] City's charter § 17.11(b) (Acts 1960, c. 7. pp. 12, 13: Acts 1968, c. 644, pp. 972, 980) vests Council with jurisdiction over special use permits and provides in part that "the council may impose such conditions upon the use of the land, buildings and structures as will, in its opinion, protect the community and area involved and the public from adverse effects and detriments that may result therefrom." Like other legislative zoning actions, conditions imposed by such amendments must meet the test of reasonableness.

ordinance and impose conditions upon the requested use, the order infringes legislative discretion. For these reasons, the decree must be reversed in part.

As to the chancellor's two adjudications of invalidity, we affirm the decree. As to the chancellor's directions to City Council, we reverse the decree and remand the cause with instructions to modify the decree. The new decree will suspend the adjudications of invalidity for a prescribed period of time and remand the cause to City Council for further legislative action. Since City made no showing of an alternative reasonable use, the new decree will enjoin Council during that period from taking any action which would disallow the one use shown by the record to be reasonable, subject to Council's right under its charter to amend a permit ordinance and impose reasonable conditions not inconsistent with such use. The new decree will further provide that if Council fails to comply within the time prescribed, the adjudications of invalidity will become operative and the injunction will become permanent, provided that landowners shall not put their property to any use other than the use shown by the record to be reasonable.

*Affirmed in part, reversed in part and remanded.*