## Richmond

BOARD OF SUPERVISORS OF FAIRFAX COUNTY v. THOMAS R. WILLIAMS, ET AL.

June 13, 1975.

Record No. 730996.

Present, All the Justices.

*George A. Symanski, Jr.*, Assistant County Attorney (*Frederic Lee Ruck*, County Attorney, on brief), for appellant.

*John T. Hazel, Jr.* (*Francis A. McDermott; Hazel, Beckhorn & Hanes*, on brief), for appellees.

Carrico, J., delivered the opinion of the court.

In this zoning case, the trial court declared "unreasonable, arbitrary and capricious" the denial by the Board of Supervisors of Fairfax County of two applications for rezoning filed by the owners of adjoining tracts of land. The Board seeks reversal of the trial court's declaration.

The land in question consists of two undeveloped tracts totaling approximately 418 acres located in the southern portion of Fairfax County. Existing zoning, RE-1, in effect for a number of years, permits development on the basis of one single-family-dwelling unit per acre.

On July 27, 1970, Thomas R. Williams and James L. McIlvaine, owners of one of the tracts, filed an application with the Board for rezoning of their land to R-12.5, a classification which permits up to 2.9 dwelling units per acre. On June 14, 1971, Van Metre Associates, Inc., equitable owner of the second tract, filed an application for similar rezoning. The Board refused to hear the rezoning requests and was forced by court order to take action on the applications. On November 20, 1972, the Board denied the Williams-McIlvaine application, and on December 18, 1972, it denied the Van Metre application.

The owners of the respective tracts of land then proceeded by way of separate petitions for declaratory judgment to have declared void the Board's denial of the rezoning requests. The two matters were consolidated, and, after a protracted hearing, the trial court, by order entered July 25, 1973, held that the Board's denial of the rezoning applications was unreasonable, arbitrary, and capricious. In its order, the court directed the Board to reconsider the applications within a reasonable time and to rezone the land to a category permitting development at a density higher than permitted under the existing RE-1 classification. The Board took no action on the court's directive, but instead prosecuted this appeal.

In the trial court, the inquiry focused upon two issues: (1) whether certain public facilities, namely, highways, schools, and sewage disposal, were available to serve the land in question, and (2) whether the Board's denial of the rezoning requests was discriminatory. On appeal, the same two issues are paramount.

The Board takes the position that its denial of the rezoning requests was "mandated by state law and deficiencies in public facilities." The

state law on planning and zoning, the Board argues, authorizes it to decide "when" public facilities "will be available," requires it to plan the growth of Fairfax County and to provide public facilities "consonant with the efficient and economical use of public funds" (Code § 15.1-427), and demands that its zoning actions protect against "undue density of population in relation to the community facilities existing or available" (Code § 15.1-489).

Public facilities to serve the land in question are inadequate, the Board asserts, and it has determined by an adopted policy that higher-density development of the area in which the land in question is located "should not occur until public facilities are adequate." Its adopted policy, part of a comprehensive plan for the area in question, reflects an awareness, the Board says, of the greater need for public facilities in other areas of the county where urban densities already exist, in contrast to the area in question where, although there is pressure for urbanization, there does not yet exist the capacity to support development at higher densities. Its adopted policy, the Board maintains, constitutes a rational plan recognizing the inadequacy of existing facilities, which requires that the area in question develop at one residential unit per acre until "sometime in the future" when provision of additional public facilities "might" warrant "a more intense use of that land." And, the Board concludes, because its decision to deny the present rezoning requests was consistent with the rational scheme of its adopted policy, the denial was not discriminatory.

■ We have no quarrel with the Board concerning its contention, set forth in the foregoing statement of its position, that in its zoning actions it must protect against "undue density of population in relation to the community facilities existing or available" and must make provision for public facilities "consonant with the efficient and economical use of public funds." The Board's position in this case, however, is at odds, in its essential elements, with the important findings of the trial court. Immediately upon conclusion of the hearing below, the trial judge stated:

"The Court finds as a matter of fact from the evidence that the public facilities to serve this land are either presently available or will be available in the reasonably foreseeable future.

"The property along the entire eastern boundary of the Van Metre land is presently zoned [for higher density development]. Just to the north of this land are commercial sites plus townhouses, not too

many hundred feet away from that little tip on the Van Metre land. And also, next to that tip is [property zoned for townhouse development].
"Under these circumstances, the Court is of the opinion that to keep this land in one-acre zoning is unreasonable and arbitrary and capricious."

Thus, the trial court found that (1) public facilities were or soon would be available to serve the land in question, (2) nearby similarly-situated property had already been rezoned for higher-density use, (3) existing zoning of the land in question was unreasonable and therefore invalid, and (4) it was discriminatory and therefore arbitrary and capricious to deny higher-density zoning to the land in question. The crucial question is whether the evidence supports the trial court's findings.

The evidence shows that the land in question is located in the Middle Run subwatershed of the Pohick Creek watershed, in an area of Fairfax County south of the Capital Beltway and west of Interstate Highway No. 95. The Pohick Creek watershed, containing approximately 20,000 acres, consists of three segments: Main Branch containing approximately 11,000 acres, Middle Run containing approximately 2500 acres, and South Run containing approximately 6500 acres.

Because of urban development spreading southwardly from Washington, D. C., the Board in 1964 adopted a sewerage plan for the Pohick watershed as part of the county's integrated sewer system. In 1965, issuance of bonds in the sum of $20 million to implement construction of the integrated system was approved by county voters.

The Pohick sewer plan provided for a sewage treatment plant near the mouth of Pohick Creek and a trunkline serving the Main Branch. The plan provided for no sewerage service in the South Run area and contemplated construction with funds from private developers of a trunkline to serve the Middle Run area. In early 1966, the county entered into a written contract with two developer-owners whereby the latter agreed to defray the cost, several hundred thousand dollars, to construct a trunkline to serve all the land in the Middle Run area. Under the agreement, the developers were to be reimbursed by the county from assessments imposed upon other property owners using the line. As a result of the agreement, a 15-inch trunkline was con-

structed to the eastern boundary of the land involved in the present rezoning applications.

On February 14, 1966, the county planning staff submitted to the Board a proposed comprehensive plan for the future development of the Pohick watershed. At the time, much of the land in the watershed was zoned for single-family occupancy on one-acre or larger lots, although substantial areas had recently been rezoned for development on smaller lots. The proposal emphasized that low-density "development does not provide for the efficient and economical provision of public facilities such as streets and highways, effective mass transit facilities, sewer, water, and drainage systems."

The Board adopted the plan on January 18, 1967. The plan provided for residential development in the Main Branch and Middle Run areas on smaller lots, furnishing a population density of 10 persons per acre. Pursuant to the plan, a number of parcels of land were rezoned for higher-density development, including property contiguous to the eastern boundary of the land involved in the present controversy.

In July, 1968, because the 1967 plan had not been interpreted as intended and a "sprawl development pattern was emerging," the Board ordered its planning staff to restudy the Pohick watershed. In January, 1969, the staff submitted its report, recommending that the Main Branch area be declared a "development zone," where development would be encouraged, and that the Middle Run and South Run areas be declared "holding zones," where development would be postponed.

In discussions on the restudy report, the Board was advised by the county attorney that "the holding zone technique, as propounded, is just not sustainable from a legal standpoint." Supervisor Bowman, the leading advocate on the Board of a policy of "staging or timing" development, acknowledged that the "holding zone concept," without further enabling legislation, was "beyond the realm of authority" of the Board. He pointed out, however, that, although the Board had unsuccessfully sought General Assembly authority "relating to the timing of development,"[1] there were "other tools available" to ac-

---

[1] This statement concerned efforts during the 1968 and 1969 sessions of the General Assembly to secure the desired legislation. Later, at the 1972 session, Senate Bill No. 95 was offered. The bill was intended to amend Code § 15.1-486 to permit the "timing" by zoning ordinances "of the development of uses otherwise permitted, when public facilities, including utilities, transportation, education, protective and

complish the same objective as the "holding zone concept," namely, "the object of inhibiting, or deferring, or restraining development of certain densities." Upon motion of Supervisor Bowman, a resolution was adopted which stated, in part:

"It shall be the policy of the Board of Supervisors to avoid the presence of a population of urban density in the Middle Run sub-watershed until such time as public facilities and services commensurate with such density either shall be available or shall be programmed to be available in the reasonably near future."

On September 10, 1969, the Board adopted the restudy report, with certain modifications, as a comprehensive plan for development of the Pohick watershed. The plan designated the various areas of the watershed as "neighborhoods." [2] The land in question is located in neighborhoods 12 and 13, in which development is contemplated at a rate of up to two dwelling units per acre under conventional development and up to 2.2 dwelling units per acre under cluster development.

In addition to the previously-quoted Board resolution, the Pohick Plan contained statements of policy for future development of the watershed. In the statements, the South Run area was designated a holding zone. No reference, however, was made to a holding zone with respect to the Middle Run area. Instead, the policy statements concerning Middle Run declared:

"Between now and 1975, land development in the Pohick watershed should be limited to areas in the Main Branch that are north of the Southern Railroad right of way, west of Rolling Road, and in the vicinity of Lorton. Public expenditures for roads and community facilities between now and 1975 should be concentrated in these areas.

"Between 1975 and 1980, land development in the Pohick watershed should be limited to the Main Branch and Middle Run areas.

recreational facilities, are not deemed by the governing body to be adequate to support development otherwise permitted in the district." The bill was not enacted into law.

[2] The plan describes a "neighborhood" as follows:

"A neighborhood is devoted primarily to single-family residences and residentially oriented uses—churches, elementary schools, neighborhood parks, and neighborhood shopping centers. A neighborhood normally contains 5,000 people and is bounded by expressways, arterial highways, or other barriers."

Public expenditures for roads and community facilities should be concentrated in these areas."

A provision of the plan required annual review by the Board to determine whether public agency capacity had become adequate to permit higher-density development in the Middle Run area. Such annual review, however, was not undertaken by the Board.

At the time the Pohick Restudy Report was adopted in 1969, 850 acres, or 33.5%, of the 2542 acres included in the Middle Run area had already been zoned for higher-density development. Immediately following adoption of the Report, the Board granted two applications for higher-density zoning involving 121 acres in the Middle Run area and, shortly before commencement of the trial of the present case, the Board granted another application for similar zoning involving 64 acres. Consequently, at the time of trial, 1035 acres, or 41%, of the 2542 acres in Middle Run had been rezoned for higher-density development.

As a result of the Board's rezoning actions, the land in question bordered, along the entirety of its more than 7,000-foot eastern boundary, property in the Middle Run area zoned for higher-density development, including townhouse construction. Several hundred feet to the north, although located in the Main Branch area, property is zoned for commercial and higher-density residential use.

As has been noted, adequacy of highways to serve the land in question was one of the concerns in the trial court. There was evidence that the present roads are inadequate to support higher-density development of the land in question. There was other evidence, however, that the road system was being improved and was slated for further improvement. And it was shown that improvement of highway facilities followed, rather than preceded, development of an area.

Adequacy of school facilities was also an item of concern in the trial court, although, on appeal, the Board appears to have lost interest in the point, devoting only the following lines to argument in its opening brief:

"Schools are also a valid consideration in a zoning decision. *Va. Code Ann.* § 15.1-489. Schools in the area were and will continue to be deficient."

The evidence fails to show, however, any serious deficiency in schools to serve the area. Indeed, the evidence shows that the previously-rapid increase in the county school population had "leveled off" and there were schools not filled to capacity so located that, with some busing, they could serve the land in question. Although the county had established a policy of attempting to construct elementary schools within walking distance of homes in a neighborhood, it was shown that the policy was an ideal not followed in practice and that more than half the county's school population was bused with the use of some 650 vehicles. A school official acknowledged that the increased number of school children resulting from development at higher density of the land in question could be "absorbed," without "undue burden," into the present system. And, as with highways, it was shown that provision of schools to serve a particular area followed, rather than preceded, development of the area.

Adequacy of sewerage facilities was the other item of concern in the trial court. Although the sewer trunkline constructed with funds provided by private developers is in place at one of the boundaries of the land in question, treatment facilities are not presently available because the plant serving the Pohick watershed has become overloaded and a moratorium has been imposed upon additional connections. Treatment capacity, however, will be doubled upon completion in early 1976 of construction now in progress and the Pohick watershed then will have sufficient capacity available. At the commencement of the hearing below, the owners of the land in question stipulated that if the trial court ruled in their favor they would not use the ruling to demand development of the land "prior to the sewer being available." [3] So the question of the adequacy of sewerage facilities became, at most, a mere side issue.

With reference to developability of the land in question, there was testimony that because of its topography and location, it was "far superior" to other property in the Middle Run area. While it was conceded that the owners could develop the land under its existing one-acre zoning "and not lose money," an expert appraiser testified that it would "border on [the] ridiculous" to develop under existing zoning. The witness gave as reasons for his opinion: (1) "the charac-

---

[3] The Board now complains that the trial court, in accepting the stipulation, improperly permitted the "introduction of new factors into a legislative decision at the time of judicial review." The Board, however, failed to object when the stipulation was offered, and the complaint will not be considered on appeal. Rule 5:7, Rules of Court.

ter of the community has changed [and] is no longer an RE-1 neighborhood," (2) the comparatively-higher per-unit cost of development under one-acre zoning "makes [higher-density development] extremely feasible and certainly is reasonable," (3) as presently zoned, the land has a value of $1,922,500.00, but if zoned for development at 2.2 dwelling units per acre it would have a value of $4,367,368.00, or a difference of approximately $2,445,000.00, and (4) "a tremendous shortage of buildable lots" exists in Fairfax County and a developer would not attempt "to go" with one-acre zoning "as opposed to holding and going" to a yield of 2.2 units per acre.

The availability of building sites and the economics of building in Fairfax County were the subjects of comment by a number of witnesses. The expert appraiser, previously mentioned, stated that the shortage of buildable lots had caused an increase in cost of building sites and this was the reason "building costs have gone up so fantastically." One of the owners of the land in question testified that he had "looked from border-to-border in the county for buildable property at an economical basis." A school official opined that because the county had become "a higher-cost place to live," it is almost prohibitive for "a working family with young children to come in."

An expert in urban land economics stated that land in the county is so "zoned and structured," resulting in expensive development on one-acre or larger sites, that the county "is becoming more and more a place not simply for the affluent but for the fairly rich." Pointing out that only 3.3% of the undeveloped land in the Pohick watershed was zoned for higher-density residential development, the witness stated that this was an insufficient supply of developable land. When he attempted to describe the "whole pattern of large-lot zoning" as "exclusionary," the Board's objection to his use of the word "exclusionary" was sustained. He then said that he could answer "without using that word," and continued:

> "The availability of land in Fairfax County is now such that in the one-acre and up category there is a great deal of land and so the way in which the land is being managed, only those with substantial means can afford to move into the County. People who would, let us say, earn in the $20,000-a-year category, people who would buy houses in the $50,000 category, do not have adequate opportunity, and people under 40 get very thin, and under that you can forget."

As previously noted, the trial court made four important findings: (1) public facilities were or soon would be available to serve the land in question, (2) nearby similarly-situated property had already been rezoned for higher-density use, (3) existing zoning of the land in question was unreasonable and therefore invalid, and (4) it was discriminatory and therefore arbitrary and capricious to deny higher-density zoning to the land in question. We are of opinion that the record supports each and every one of these findings of the trial court.

In reaching this conclusion, we have not overlooked, but have given full credit to, the presumption of validity which accompanies the Board's denial of the rezoning requests in this case. The denial was legislative action, action which is presumed to be reasonable. Although this presumption of reasonableness is not conclusive, it survives until the one who attacks the legislative action, and upon whom the burden of proof rests, shows clearly that the action is unreasonable. *Board of Supervisors of Fairfax County* v. *Carper*, 200 Va. 653, 660, 107 S.E.2d 390, 395 (1959).

We are concerned, then, with the reasonableness of the Board's action in denying the rezoning requests. This legislative action was reasonable if the matter in issue, *viz.*, the proper zoning classification of the land in question, is fairly debatable. *County of Fairfax* v. *Parker*, 186 Va. 675, 680, 44 S.E.2d 9, 12 (1947). The emphasis here is upon the word "fairly." Given the human tendency to debate any question, an issue may be said to be *fairly* debatable when the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions. The evidence to be sufficient for this purpose must meet not only a quantitative but also a qualitative test; it must be evidence which is not only substantial but relevant and material as well.

In determining whether, in a given case, the presumption of reasonableness of zoning actions prevails or is overcome, we have established these maxims:

"Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness. If evidence of reasonableness is sufficient to make the question fairly debatable, the ordinance 'must be sustained.' If not, the evidence of unreasonableness defeats the presumption of reasonableness and the ordinance cannot be sustained."

*Board of Supervisors of Fairfax County* v. *Snell Construction Corp.*, 214 Va. 655, 659, 202 S.E.2d 889, 893 (1974).

In the present case, the evidence presented by the owners of the land in question showed that the existing zoning was unreasonable and that higher-density zoning was reasonable. The landowners' evidence showed that their property was suitable for higher-density development; that the character of the neighborhood had changed materially from the time the land was placed in its one-acre category and even from the time the Board affirmed that classification in 1969; that there was a need for housing constructed on sites smaller than permitted under the existing one-acre classification; that public facilities were or soon would be available to serve the land; and that the land bordered or was nearby other similarly-situated property already zoned for higher-density use.

This evidence was sufficient to neutralize the presumption of reasonableness which attached to the Board's denial of the rezoning requests and to shift to the Board the burden of producing evidence to establish the reasonableness of its zoning action. *City of Richmond* v. *Randall*, 215 Va. 506, 511, 211 S.E.2d 56, 60 (1975). In attempting to carry its burden, the Board relied exclusively upon the Middle Run policies of its 1969 Pohick Creek comprehensive plan, policies which were intended to "avoid" higher-density zoning in the Middle Run area until public facilities "shall be available or shall be programmed to be available in the reasonably near future." The factual underpinning of the Board's reliance failed, of course, with the trial court's finding, supported by the evidence, that "public facilities to serve [the land in question] are either presently available or will be available in the reasonably foreseeable future."

But even more disastrous to the position of the Board is the evidence that, despite its policy of avoiding higher-density development in the Middle Run area, at the very moment of the adoption of the policies there was already rezoned for higher-density development one-third of the land comprising the area which the Board declared should not develop until at least 1975. Immediately following adoption of the policies, the Board rezoned for higher-density development an additional 121 acres in the same area. And, shortly before commencement of trial of the present case, the Board granted the preferred higher-density status to another 64 acres in the Middle Run area.

It is true, as the Board points out, that a comprehensive plan, similar to the Pohick plan embodying the Middle Run policies, is merely

a guide for development, rather than an instrument of land use control. In this case, however, the Board, relying upon the density provisions, has used its plan as a sword to permit development of some property in the Middle Run area and, relying upon the timing provisions, has used the plan as a shield to justify denial of similar treatment to other property in the same area.

It is also true, as the Board points out, that the fixing of boundary lines of zoning districts is, by nature, more or less arbitrary. In drawing the line between the land in question "and the urban-density zoning to the east and northeast," the Board says, it was merely exercising its legislative discretion. The drawing of such lines, however, must rest upon some rational basis to withstand a charge of unreasonableness. In this case, the line between the land in question and the adjoining property is not the only important line. Equally important are the lines the Board drew around the entire Middle Run area. In drawing those lines, the Board included similarly-situated but dissimilarly-zoned property, added to the dissimilarity in disregard of its own policies, and has offered nothing, save the Middle Run policies themselves, as a basis for distinction.

The effect of the application of the Board's Middle Run policies was to discriminate between similarly-situated property. In the present case, the discrimination was specifically and dramatically directed at the land in question. While hearing and granting other rezoning requests in the Middle Run area, the Board refused even to consider the present requests until forced by court action to hear the applications. But more important, the land in question extensively borders or is nearby other property already zoned for higher-density use. No demonstrated real difference distinguishes the various properties and justifies granting preferred status to one property while denying it to another. This is the same type discriminatory practice described as arbitrary and capricious and therefore condemned in *Board of Supervisors of Fairfax County* v. *Allman*, 215 Va. 434, 211 S.E.2d 48 (1975).

Another discriminatory effect, although perhaps unintended, of the Board's zoning policies was to elevate the cost of building sites and housing and thus tend to exclude from portions of Fairfax County those persons who do not have the "substantial means" to "afford to move into the County." Zoning action with similar exclusionary effect was held inpermissible in *Board of Supervisors of Fairfax County* v. *Carper, supra.*

Under all the circumstances of this case, the reasonableness of the Board's action in denying higher-density zoning to the land in question is not fairly debatable. We affirm the trial court's findings that the existing RE-1 zoning is invalid as applied to the land in question, and that the Board's denial of the rezoning application was arbitrary and capricious. The case will be remanded to the trial court with instructions to enter another order. The new order will suspend the adjudication of invalidity for a prescribed period of time and direct the Board to consider further legislative action. Since the evidence shows that the alternative uses proposed by the owners[4] are reasonable uses, and that either zoning classification R-17 or R-12.5 would permit such uses, the new order will enjoin the Board during the prescribed period from taking any action which would disallow these uses. The new order will further provide that should the Board fail to comply within the prescribed period, the adjudication of invalidity will become operative and the injunction will become permanent, provided that the landowners shall not put their property to any uses other than those shown by the record to be reasonable.

*Affirmed and remanded.*

COCHRAN, J., dissenting.

As the record in this case establishes to my satisfaction that the chancellor erred in ruling that the Board of Supervisors acted unreasonably and invalidly in denying the applications for rezoning from RE-1 classification to a category that would permit higher density use I respectfully dissent.

The two tracts, comprising approximately 418 acres of undeveloped land, lie in the southern part of Fairfax County in what the County has designated as Neighborhoods 12 and 13 of the Middle Run, one of three subwatersheds of the Pohick watershed. The Pohick watershed contains approximately 20,000 acres, of which approximately 11,000 acres are in the Main Branch, 2,500 acres in the Middle Run, and 6,500 acres in the South Run.

In 1965, the issuance of bonds was approved, by public referendum, to finance the extension of the County sanitary sewer system

---

[4] During trial, the landowners expressed a willingness to accept R-17 zoning, an intermediate classification between RE-1 and R-12.5. In its oral opinion, the trial court indicated that its directive to the Board permitted consideration of the R-17 classification. Our remand carries the same indication.

into the Pohick watershed. The following year the County entered into a contract with two property owners whereby the County, at the expense of the property owners, constructed the extension of sewer trunk lines from the Main Branch of the Pohick into the Middle Run. Reimbursement of the two property owners was to come from landowners connecting their sewer lines to the trunks.

In 1967, the County approved for the Pohick watershed a comprehensive plan, which was revised and amplified in the Restudy of the Pohick Watershed (hereinafter, the Plan), approved by the Board on September 10, 1969. The Plan contemplates ultimate overall density in Neighborhoods 12 and 13 of the Middle Run to range from a maximum of 2.0 dwelling units per acre, under conventional development, to 2.2 dwelling units per acre under cluster development. It contemplates a continuation of existing zoning in the Middle Run until 1975, and then development between 1975 and 1980 to densities throughout the subwatershed to an average of 2.0 dwelling units per acre.

The applications in question, which sought rezoning to R-12.5, a category which permits up to 2.9 dwelling units per acre, or approximately 1,212 houses on the applicants' lands, were filed in 1970 and 1971, respectively. Action on the applications, long delayed by County officials, was forced by court orders. Based primarily on inadequacy of public facilities to justify urban density development in this area when areas already zoned or developed for urban densities had higher priority needs, the professional staff of the Planning Commission recommended denial of the applications. In September, 1972, the Planning Commission unanimously recommended to the Board that the Williams-McIlvaine application be denied and in November, 1972, unanimously recommended, with one abstention, the denial of the Van Metre application. In November and December, 1972, the Board, with two members absent, unanimously denied the applications.

The Board's assignments of error raise one crucial question, whether the chancellor erred in ruling that the Board's action in denying the landowners' applications for rezoning of their properties from RE-1 to a higher density category was unreasonable and invalid.

There is a presumption of legislative validity in the Board's actions in denying the applications. When an applicant for rezoning adduces evidence that the existing zoning ordinance, as applied to his land, is arbitrary, capricious and, therefore, invalid, and that the requested

rezoning is reasonable, he has made a prima facie showing that the denial of his application is unreasonable, and the burden shifts to the legislative body to adduce evidence of reasonableness. If the evidence is sufficient to make the question of reasonableness fairly debatable, the legislative action must be sustained. See *City of Richmond* v. *Randall, et al.*, 215 Va. 506, 211 S.E.2d 56 (1975); *Fairfax County* v. *Snell Corp.*, 214 Va. 655, 659, 202 S.E.2d 889, 893 (1974).

The chancellor, who heard the evidence *ore tenus*, found "as a matter of fact . . . that the public facilities to serve this land are either presently available or will be available in the reasonably foreseeable future." He further found that property along the eastern boundary of the Van Metre tract and other nearby land to the north were zoned to a higher density than RE-1, and the chancellor held that "[u]nder these circumstances, the Court is of the opinion that to keep this land in one-acre zoning is unreasonable and arbitrary and capricious."

The chancellor's findings of fact are, of course, entitled to great weight and, if supported by credible evidence, will be affirmed. Code § 8-491 (Repl. Vol. 1957); *White and P & W Oil Co.* v. *Perkins*, 213 Va. 129, 189 S.E.2d 315 (1972).

The evidence of the applicants shows that trunk sewer lines are available and that the moratorium on sewer connections, imposed because of overloaded treatment facilities, will be removed upon completion of construction, projected to be in March or April of 1976, that will double the capacity of the Lower Potomac Treatment Plant.

Evidence as to public school facilities shows that, if the applicants' lands were rezoned to higher density, the County could accommodate the additional children in the school system. To accomplish this, however, it would be necessary to resort to busing children to under-capacity school buildings, and it might be necessary to use temporary classroom facilities or go to two shifts. The County has a neighborhood school policy whereby schools are located so that elementary school pupils are within walking distance. For this reason the capacity of an elementary school planned for the area has been reduced from 990 to 660 students, and the school will be filled the day it opens. However, the neighborhood school policy is not fully implemented, and the County buses about one half its school population, including some elementary school pupils. Moreover, subdividers are generally required to dedicate school sites as a prerequi-

site to approval of their subdivision plans, so that additional buildings may be constructed to meet the additional needs.

The applicants' evidence shows that roads in the area are being improved and that the Virginia Department of Highways plans in 1977 or 1978 to let bids for further improvement of Old Keene Mill Road to give adequate access from the applicants' lands eastward to Interstate Highway 95. On the other hand, the Board's evidence shows that the system of secondary roads near the subject lands is deficient and that the proposed rezoning would increase the use of the road system by as many as 11,000 additional vehicle-trips each day.

On this evidence I agree with the majority opinion that the chancellor's findings of fact as to the availability of public facilities were not wrong as a matter of law. But a finding that facilities are available *or will become available in the reasonably "foreseeable" future* to accommodate higher density zoning, although it may be sufficient to show that the requested rezoning would be reasonable, is not of itself sufficient to invalidate the present zoning as to applicants' lands.

The uncontradicted evidence shows that, unlike the zonings invalidated in *City of Richmond* v. *Randall, supra,* and in *Boggs* v. *Board of Supervisors,* 211 Va. 488, 178 S.E.2d 508 (1971), the present RE-1 zoning does not of itself effect an unconstitutional denial of due process by depriving the applicants of all beneficial use of their property. It was stipulated that the property could be developed at some profit under RE-1 zoning. The evidence indicates that much greater profit could be realized from higher density development. Applicants' expert appraiser, McKenzie Downs, was unwilling to say that the developer would make "a substantial amount more money" under higher density zoning. He testified, however, that it "could border on being somewhat ridiculous" to develop the lands under RE-1 zoning "in view of the change of the character of this neighborhood and the fact that on the southeast side of it, R-17 zoning [permitting maximum density of 2.2 dwelling units per acre] has been granted and that land will be developed in that manner."

There is other evidence that low cost residential property is nonexistent in the county, that the school population has leveled off because young couples with children cannot afford to live in the county, that there is a demand for cheaper housing, and that houses in RE-1 zoning areas now sell for $70,000-$80,000 contrasted with town houses at $40,000-$50,000 in higher density zones.

The evidence shows that higher density zoning for the subject lands would not be unreasonable. Our concern, however, is the reasonableness of the Board's actions in continuing the present zoning. If that is fairly debatable, then the denial of the applications must be upheld.

The Board's evidence shows that its policy was to retard development in the Middle Run until public facilities could be made available to other areas already zoned to higher density and under development. The Board's witnesses testified that the Plan contemplates higher density zoning for the entire Middle Run between 1975 and 1980, that higher density rezoning, in accordance with the Plan, had been granted in portions of the Main Branch, and that Neighborhood 14 of the Middle Run, adjacent to higher density development, had already been rezoned to higher density in advance of the schedule projected in the Plan. The Board's policy, the witnesses asserted, was based on economical use of County resources in providing public facilities in an orderly manner consistent with phased development.

The landowners' reliance on *Board of Supervisors* v. *Carper*, 200 Va. 653, 107 S.E.2d 390 (1959), is misplaced. There, we held invalid an amendment to the Fairfax County zoning ordinance that generally zoned the western two-thirds of the county for one agricultural district with development permitted on lots of a minimum size of two acres. Although it was conceded that the county could properly zone a reasonable area for two-acre lot development, we held that the zoning in question was exclusionary, forcing those with low incomes into the more densely developed eastern one-third of the county, and that it was therefore invalid. We noted that in *Simon* v. *Town of Needham*, 311 Mass. 560, 42 N.E.2d 516, 519 (1942), the Massachusetts court held that, in determining the reasonableness of a zoning ordinance, the economic effect of the ordinance could be considered "as more or less incidental." We also held that the "grandfather" clause in the amendment, which, for a period of two years after adoption of the ordinance, permitted developers to record plats of lots of a minimum size of one-half acre, was lacking in uniformity in violation of the enabling statute.

We further held in *Carper* that the enabling legislation which authorized counties to adopt ordinances to regulate "the density and distribution of population," did not give "the right arbitrarily or capriciously to deprive a person of the legitimate use of his property." We affirmed the finding of the trial court that the two-acre restriction was unreasonable and arbitrary and bore "no relation to

the health, safety, morals or general welfare of the owners or residents of the area so zoned."

The enabling legislation has been revised[1] since *Carper,* but the revision has not affected the principle therein set forth, that the Board cannot be empowered to act arbitrarily or capriciously to deprive landowners of the legitimate use of their lands. Insofar as *Carper* held that any economic effect on the county of rezoning may be considered only incidentally, I conclude that the revision of the enabling legislation (Code § 15.1-489) has modified the holding.

I further conclude, therefore, that in the present case the enabling legislation authorized the Board to provide, through zoning, for phased development "consonant with the efficient and economical use of public funds," but that this authorization for phased development could not be arbitrarily or capriciously used by the Board to deprive the applicants of the legitimate use of their land. I attach no significance to the failure of the 1972 General Assembly to enact into law S. B. 95 which would have explicitly vested authority in the Board to provide for phased development. The General Assembly may have concluded, as I have concluded, that such authority was already vested in the Board.

We have seen that the Board's action did not deprive the applicants of all beneficial use of their land, because admittedly the land could be developed under the present zoning. But the chancellor based his

---

[1] Code § 15.1-427 (Repl. Vol. 1973) provides in pertinent part:

"This chapter is intended to encourage local governments to improve public health, safety, convenience or welfare and to plan for the future development of communities to the end that transportation systems be carefully planned; that new community centers be developed with adequate highway, utility, health, educational, and recreational facilities; that the needs of agriculture, industry and business be recognized in future growth; that residential areas be provided with healthy surrounding for family life; and *that the growth of the community be consonant with the efficient and economical use of public funds."* (Emphasis added.)

Code § 15.1-489 (Repl. Vol. 1973) provides in pertinent part:

*"Zoning ordinances shall be for the general purpose of promoting the health, safety or general welfare of the public and of further accomplishing the objectives of* § *15.1-427.* To these ends, such ordinances shall be designed (1) to provide for adequate light, air, convenience of access, and safety from fire, flood and other dangers; (2) to reduce or prevent congestion in the public streets; (3) to facilitate the creation of a convenient, attractive and harmonious community; (4) *to expedite the provision of adequate* police and fire protection, disaster evacuation, civil defense, *transportation, water, sewerage, flood protection, schools, parks, forests, playgrounds, recreational facilities, airports and other public requirements;* . . . (6) *to protect against one or more of the following: overcrowding of land, undue density of population in relation to the community facilities existing or available, obstruction of light and air, danger and congestion in travel and transportation,* or loss of life, health, or property from fire, flood, panic or other dangers; . . ."* (Emphasis added.)

decision in part on his finding that other adjacent and nearby lands had been rezoned to higher densities. This requires a review of the relevant zoning classification and the Plan on which it is based.

At the time of adoption of the Pohick Plan in 1967 approximately 850 acres in the Middle Run, including the land adjacent to the applicants' property along the eastern boundary, were zoned R-17. In the 1969 Restudy various policies were approved, including the following:

"Policy 2
The construction of community facilities should occur in accordance with the stages of land development.

— Between now and 1975, the construction of community facilities should be limited to areas in the Main Branch that are north of the Southern Railroad, west of Rolling Road, and in the vicinity of Lorton.
— Between 1975 and 1980, the construction of community facilities should be limited to the Main Branch and Middle Run areas.
— No community facilities should be constructed in the South Run area before 1980."

The applicants contend that the Board breached its own comprehensive plan by denying the requested rezoning and approving higher density rezoning for other applicants similarly situated. The Board correctly maintains that the comprehensive plan is not a zoning ordinance but is merely a guideline. *Fairfax County v. Snell Corp., supra,* 214 Va. at 660, 292 S.E.2d at 894 (1974). However, adherence to or departure from the Plan may be considered in determining whether the Board has acted reasonably in fixing zoning classifications and in acting on the rezoning applications of the applicants and others similarly situated, or whether it has denied the applicants their constitutional right to equal protection.

The applicants correctly insist that the Plan contemplates higher density zoning for their lands, but they ignore the timing of the rezoning, as it relates to the provision of public facilities, contemplated by the Plan.

Of the rezonings alleged to show discrimination by the Board against the applicants, all but four were in the Main Branch in areas

where the Plan called for development of community facilities by 1975. Three of the four rezonings in the Middle Run were in Neighborhood 14, abutting higher density zoning and development to the east in the Main Branch.

The fourth rezoning in the Middle Run of which the applicants complained involves property already zoned R-17 at the time the Pohick Plan was adopted in 1967, and therefore not similarly situated to their property. In 1971 the Board rezoned the tract RTC-10 to permit townhouses, but the Board's Director of the Division of Zoning Administration testified without contradiction that the rezoning, as approved, merely resulted in a change in the form of development without any increase in the density.

Although the Board failed to review Middle Run policies each year, as the Plan required, the Board did consider the policies whenever rezoning applications were considered, and formally reviewed the policies in 1973. The Plan was not followed to the letter, and such was not necessary, but the Board followed it as a guideline and, indeed, as to Neighborhood 14, granted rezoning applications sooner than the Plan contemplated.

Tht present case is, in my view, distinguishable from *Fairfax County* v. *Allman*, 215 Va. 434, 211 S.E.2d 48 (1975). There the Master Plan approved for the area of Fairfax County which included the Allman property contemplated an ultimate density of 2.5 units per acre but established no guidelines for determining when the ultimate density should be attained. There was no provision for phased development within specified periods of time. In the present case there was such provision which, though not binding, evidences the best judgment of the Board as to availability of public facilities and its good faith intention to permit higher density development within the time limits contemplated in the Plan.

In *Allman* we held that the presumption of legislative validity that attached to the action of the Board in denying the rezoning application had been overcome by the applicant's evidence that the action was capricious and arbitrary, that the Board failed to rebut this prima facie case by adducing sufficient evidence to make the matter "fairly debatable," and that the trial court by necessary implication ruled that the existing zoning ordinance, as applied to the applicant's property, was unreasonable and invalid. We held, in effect, that the trial court, in making this determination, could properly apply all factors relevant to reasonableness and that the Board's evidence showing that the property could be developed at a profit under existing zon-

ing was not of itself as a matter of law sufficient to make the reasonableness of the existing ordinance fairly debatable.

We also concluded in *Allman* that the Board discriminated against the landowner by denying his application for rezoning to a higher density and then granting the application of Clinch Corporation, pending at the same time, to rezone its land one mile away, the development of which involved the same problems for the county. The Board made no effort to distinguish the applications of the two similarly situated landowners, except to state that it had erred in rezoning the Clinch land, and its denial of the Allman application, absent any other justification, was therefore discriminatory.

Mere inequality of treatment among neighboring landowners is not of itself unconstitutional. Any zoning ordinance may involve unequal treatment, but such unequal treatment is proscribed only when it is invidious, or "arbitrary and capricious." In *Allman* we affirmed the rule that unequal treatment of similarly situated landowners is "arbitrary and capricious" when it lacks a rational basis and bears no substantial relation to the public health, safety, morals, or general welfare. With respect to the legislative action denying the requested rezoning, the trial court in *Allman* made such a finding, and we held that there was sufficient evidence to support that finding.

The classifications established here by the Board were based on a rational plan for orderly development of a subwatershed. The Board was justified in pursuing its policies of encouraging greater density in areas already zoned for such development by locating public facilities there before rezoning other lands and incurring the financial burden of installing additional public facilities.

The Board could reasonably determine that the "efficient and economical use of public funds" required deferral, for a reasonable time, of the rezoning of applicants' lands in order to postpone the cost of improving secondary highways that higher density development of applicants' lands would require. The secondary roads are there, as the chancellor found, but they are part of a deficient road system that heavier use could make far more deficient. The facilities are available in the county to accommodate the additional school children which the higher density zoning would bring to the school system. But to make these facilities available to the applicants' lands may require temporarily the extensive busing of school children in violation of the county's neighborhood school policy. It also may require construction of additional school buildings in areas of lower priority rather than in more highly developed neighborhoods. The

public facilities which the chancellor found would be available within the reasonably foreseeable future depend upon the appropriation of public funds by the Board. The construction of all public facilities, including schools, in the Pohick Watershed has been programmed in stages in conformity with the schedule of urban development projected in the Plan.

In using its zoning authority to regulate phased development of the county, the Board was following the legislative intent expressed in Code § 15.1-427 that community growth be "consonant with the efficient and economical use of public funds." The Board adduced sufficient evidence of the reasonableness of its actions in denying the applicants' request for higher density zoning to make the matter at least fairly debatable. Reasonable men could disagree as to the advisability of approving the applications at the time they were considered by the Board. Consequently, I conclude that the chancellor erred in ruling that the Board's legislative actions in denying the applications and in continuing the present zoning were arbitrary, unreasonable, and capricious.

I'ANSON, C.J., joins in this dissent.