USCOC OF VIRGINIA RSA# 3, INC.,
and Ernie R. Marshall,
Plaintiffs,

v.

MONTGOMERY COUNTY BOARD OF
SUPERVISORS, Defendant.

No. 7:02–CV–01065.

United States District Court,
W.D. Virginia,
Roanoke Division.

Feb. 24, 2003.

James Robert Creekmore, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, for plaintiffs.

Kevin Philip Oddo, Joseph M. Rainsbury, Flippin, Densmore, Morse & Jessee, Roanoke, VA, Martin M. McMahon, Offices of County Atty., Christiansburg, VA, for defendant.

## MEMORANDUM OPINION

KISER, Senior District Judge.

In this case, the plaintiffs challenge the defendant's denial of the plaintiffs' application for a special use permit to construct a wireless telecommunications transmission tower. Before me now are cross-motions for summary judgment. The parties have fully briefed the issues and appeared before me for oral argument on February 6, 2003. The motions are therefore ripe for disposition. For the reasons stated below, the plaintiffs' motion is granted in part and denied in part, and the defendant's motion is granted in part and denied in part.

## BACKGROUND AND PROCEDURAL HISTORY

Based on the record in the joint appendices compiled by the parties,[1] the facts of this case are as follows: Plaintiff USCOC of Virginia RSA# 3, Inc. (hereinafter "U.S. Cellular") is a Virginia corporation providing cellular telephone service in southwest Virginia under the U.S. Cellular trade name. In southwest Montgomery County, Virginia, an absence of quality wireless service existed along Virginia Route 8, the relevant portion of which travels between Christiansburg and Floyd County. This portion of Route 8 travels through the small community of Riner.

In 2000, U.S. Cellular sought to erect a tower in the Riner area to fill in the coverage gaps along Route 8 between cell sites in Radford and Christiansburg to the north and Wills Ridge to the south. U.S. Cellular identified property owned by plaintiff Ernie Marshall as the ideal location for a tower. At some point the plaintiffs reached an agreement among themselves to locate the tower on Marshall's property, which straddled both sides of Pilot Mountain along Route 8 just south of Riner. The six-mile-long ridgeline of Pilot Mountain dominates the landscape in that part of the county. Subsequent engineering studies by U.S. Cellular determined that a tower would need to be a minimum of 240 feet tall, with a 9–foot lightning rod on top, to satisfy the coverage goal. U.S. Cellular also determined that the tower would need to be a lattice structure.[2] The plans proposed locating the tower eighty feet from Marshall's property line despite the county's 100–foot setback requirement. Finally, FAA regulations required a light atop any tower above 199' in height[3]. The FAA determined that a 240' structure would not pose a hazard to air navigation.

### A. The Special Use Permit Application

On May 1, 2002, the plaintiffs, through their agent, Shenandoah Tower Services, applied for a special use permit from the Montgomery County Board of Supervisors (the "Board"). The permit application requested the parameters that U.S. Cellular's engineers had determined were necessary, namely the 240' lattice tower. The record contains three photographs of the ridgeline in Riner that a graphic artist digitally altered to reflect the view of the proposed lattice structure. The application also contained three "radio frequency propagation maps," which are maps that depict the strength and quality of a signal transmitted from a given location. These maps showed the estimated signal quality given the existing Radford and Wills Ridge transmitters plus a transmitter on the Marshall property.[4] The three different

---

1. The plaintiffs submitted one volume of exhibits marked A through E, and the defendant submitted a second volume of exhibits marked F through H. The defendant also attached to their reply memorandum as Exhibit I a copy of the relevant section of the Montgomery County Code.

2. A "lattice" structure is a tower in which steel elements interlock to form a pattern similar to an oil derrick. A "monopole" is a tower structure of one hollow metal tube onto which an antenna is mounted. A "stealth" tower is one in which the structure, the antenna, or both, are designed to blend in with surrounding vegetation or development. The "stealth monopole" that the Board ultimately approved in this case consisted of a monopole with the antennae mounted internally instead of externally.

3. The light proposed for this tower would be a red light at night and a white light in the daytime.

4. These maps are found at Exhibit A1. On these maps, green indicates the desirable coverage, blue is marginal, red is poor quality, yellow is bad or dropped call, and white is no service.

maps demonstrated the difference in the signal if the height of the Marshall tower was 240, 220, or 200 feet.

Like all counties in Virginia, Montgomery County has a comprehensive plan. Under this plan, the community of Riner itself is designated as a "Rural Expansion Area." The land surrounding Riner is largely designated "Rural," with smaller pockets of "Agricultural." South of Riner, along the ridgeline, most of the land is designated as "Conservation." Marshall's property was zoned as Agriculture(A–1) but was located within the area designated as "Conservation" in the comprehensive plan.

The county has incorporated into its comprehensive plan a two-page "Regional Approach to Telecommunication Towers," a policy it designed in conjunction with the city of Radford, the towns of Blacksburg and Christiansburg, and the county of Pulaski. Under the Regional Approach, collocation of new antennae on existing sites, such as water tanks, industrial buildings, and government facilities, is encouraged as opposed to the construction of new towers.[5] The Regional Approach's preferences for siting of new towers reads as follows:

> Siting of new communication towers in a jurisdiction should be reviewed for their potential effects on surrounding jurisdictions as well as the jurisdiction in which the structure is to be located. Newly constructed towers should be built in locations that will provide the least negative impact to the citizens of each jurisdiction. Montgomery County encourages the use of monopole and/or "stealth towers" for new sites that require new construction or "new builds". The following locations are listed from most to

least preferable when considering the siting of communication towers:

> A. Industrial parks
> B. Industrial zoned lands
> C. Commercially zoned lands
> D. High density residential lands
> E. Agriculture/Conservation zoned lands—non-ridge, wooded
> F. Agriculture/Conservation zoned lands—non-ridge, open
> G. Medium density residential lands
> H. Agriculture/Conservation zoned lands—ridgeline
> I. Low density residential lands

Exh. B17. The proposed location for the U.S. Cellular tower lay in category H of this list. In the Riner area, no land falls within categories A through D and G. Finally, the Regional Approach approves of the jurisdictions' use of consultants "to evaluate the possible alternatives and potential impacts of the request on the jurisdiction and the surrounding areas." Notably, the Regional Approach speaks in terms of "encouragement" or "preferences" as opposed to requirements.

Pursuant to the policy, the County requested that the plaintiffs evaluate existing potential collocation sites, namely a tower at a county water tank and two AEP electric transmission towers. In a memorandum dated May 1, 2002, U.S. Cellular rejected the water tank as a site because it was three miles north of the proposed Riner site, and therefore too close to the existing Radford 2 site; because the existing structure was only 110 feet tall, and therefore could not meet the Route 8 coverage objective; and because the existing structure did not appear capable of supporting a telecommunications antenna.

---

**5.** Currently, 27 freestanding wireless towers exist in Montgomery County. U.S. Cellular constructed two of the towers and has placed antennae on five other structures in the county.

Exh. A1. In a memorandum dated May 24, 2002, U.S. Cellular's RF Engineering Department rejected the AEP structure based on a propagation map showing significant holes in coverage along Route 8. Exh. A2, A3. U.S. Cellular also promised to accommodate the collocation of two additional carriers on the structure. Exh. A3. The plaintiffs addressed the location of the tower on a ridgeline in another memorandum dated May 1, 2002. They indicated that the structure had been proposed at the lowest possible height that would still meet the coverage objective. They also indicated that the structure had been located in the existing treeline to obscure the equipment shelter and the lower portion of the tower. Exh. A1.

The Montgomery County Planning Commission considered the application at its June 12, 2002 hearing. The Commission examined a report prepared by county planning staff and voted to recommend denial of the application for failure to comply with the comprehensive plan and failure to provide necessary information. The plaintiffs submitted additional information prior to the meeting of the Board of Supervisors on June 24, 2002, so the Board referred the matter back to the Planning Commission for additional study. The Planning Commission met again on July 17, 2002, and voted to table their discussion of the proposal until a consultant hired by the county delivered its report to the Commission.

In a memorandum dated July 31, 2002, Zoning Administrator Steven M. Sandy delivered to the Planning Commission the report of the county's consultants, Tradewinds Site Management ("Tradewinds") and Strategic Communications Services, Inc. ("SCS"). According to Sandy's memo,

the planning staff recommended that the Commission recommend a 199′ tower because the beacon lighting would not be required and the structure would be less visible; because a large portion of this part of the county could still receive wireless service at 199′, and because a 199′ structure could be a monopole or stealth tower as preferred in the comprehensive plan[6].

The Tradewinds report concluded:

This facility will allow U.S. Cellular to fill a legitimate void in their coverage and will allow for co-location opportunities for other service providers. If a tower of lesser height is allowed, then additional antenna sites will be require do achieve the same coverage as the requested tower. No viable co-location alternatives were found to exist. Contingent to the approval of the special use permit, the following items should be satisfactorily addressed.

1. ... The comprehensive Telecommunications plan for Montgomery County calls for Monopole construction, but due to the height of the proposed tower, consideration should be given for a variance to this plan.

 * * * * * *

4. Special consideration and precaution should be given to the tower marking/lighting to minimize the visual affects [sic] on the surrounding community. A combination white strobe/red beacon option as discussed in U.S. Cellular's submittal section 9 should be considered.

Exh. B11. The SCS report went into more specific detail and provided its own propagation maps that confirmed U.S. Cellular's

---

**6.** To clarify, the plaintiffs' proposed tower would have been a 240′ structure with a 9′ lightning rod. The structure the defendant approved was a 195′ structure with a 4′ lightning rod.

assertions. SCS indicated that coverage along Route 8 without a Riner site was poor or non-existent: "It is evident from looking at the plot that there is signal improvement needed along Route 8. In fact, there is hardly any coverage in this area at all. Both the U.S. Cellular and the Wizard plot confirm this fact." Exh. B11. SCS further stated,

The analysis did support U.S. Cellular's need for a 240′ structure at this location. The target coverage for the Riner site, using the proposed configuration, is at least 9 miles of quality signal along Route 8. The current system coverage plots show no coverage along this road. The coverage plot run at 195′ centerline indicates an approximate loss of three miles of coverage. In addition, coverage "holes" appear near in to the site along Route 8 due to propagation loss through vegetation and surrounding terrain. Requiring U.S. Cellular to build a 195′ structure would cause them to lose approximately 33% coverage along Route 8. In addition the coverage close in to the site would be poor and cause dropped calls and other performance problems.

*Id.* The SCS report considered and rejected the water tank site, which would lose 70% of the Riner site's coverage, and two AEP tower sites, which would lose 83% and 90%, respectively, of the Riner site's coverage. According to SCS, "Geographically speaking, U.S. Cellular chose the optimum site to provide maximum coverage along Route 8." *Id.* SCS concluded,

After reviewing the proposed Riner site parameters, U.S. Cellular's existing system coverage, and the surrounding terrain, the placement of the Riner site will adequately improve the coverage holes in the current U.S. Cellular system. In

addition this analysis support the fact that a 240′ structure at this location is required. It is my opinion that the applicant has significantly demonstrated the need for this site at this location at the required design parameters based on the information provided.

*Id.*

The Planning Commission met again on August 14, 2002. Sandy presented the reports of the consultants[7]. He offered his opinion that the consultant's propagation study of the 195′ tower looked similar to U.S. Cellular's propagation study at 240′. Exh. C at 15:22–16:2. He also noted that the 195′ tower provided coverage over much of the area, even though it was coded red and yellow, which indicated poor quality or bad call signals. *Id.* at 16:7–16:22. Sandy stated that the reason the staff recommended a tower under 200′ in height was to bring the tower more into compliance with the comprehensive plan:

The negative impacts of a new tower would be greatly reduced because the lighting would not be required and the structure would be less visible due to the decreased height.

Secondly, the tower height would still allow service of a large portion of this rural and mountainous portion of the county.

And then, three, the tower could be a mono-pole structure or a stealth tower as specifically stated in the comprehensive plan as what is desired as far as a structure. So, by reducing the height, we can get much more in compliance with the comprehensive plan and I think we have established that the other alternatives that are in the area are not really feasible.

7. The record contains both the minutes of the Planning Commission meeting, Ex. B12, and a transcript of the meeting from a court reporter provided by the plaintiffs, Exh. C.

*Id.* at 20:19–21:13. Planning Director Joe Powers added that the staff's recommendation was "not an engineering decision. This is a land use decision." *Id.* at 25:23–26:2. The Planning Commission unanimously voted to recommend that the Board approve a special use permit for a 199′ tower subject to seven conditions, including that the design be an unlit stealth monopole [8]. Exh. B13.

The whirlwind tour of the permit request culminated on August 26, 2002, at the meeting of the Board.[9] Sandy outlined the history of the project. He first noted the county's preference for collocation on existing sites and outlined why the plaintiffs had rejected the water tank and AEP sites. He then stated, "Now, the two sites combined could provide pretty good coverage. It is still not going to provide the coverage that the one 240–foot—the site that was proposed." Exh. D at 8:15–8:18. He also noted the previous objections to the proposal, namely that the tower was located in the second-least-preferred type of land under the Regional Approach and that the tower at 240′ would be visually intrusive both due to its height and the need for lighting. *Id.* at 10:15–11:10. Sandy then reviewed the Planning Commission's recommendation and described the rationale for the various conditions:

That the height of the tower would not exceed 199 feet, which would mean that it would not be lit, which was one issue with the Planning Commission; that having a light on it in a rural part of the county would be visually intrusive.

\* \* \* \* \* \*

Number Three, the tower should be of a mono-pole, stealth design, where all the antenna [sic] and wiring shall be mounted inside the structure.

And this is also another item that gets back to the visually intrusive aspect of the Comprehensive Plan; that the Planning Commission felt like that the hats or the platforms that you see on the towers—I am sure you have seen them around. You have the pole and, then, you have this two, or three, or four big plat forms on it and they felt like that was not attractive, and something that they didn't want to promote in the rural part of the county. It would be something that would be visually intrusive.

*Id.* at 11:24–12:5, 12:12–13:3. Board member Jim Politis, the representative from the Riner area, questioned Sandy as to the scope of the difference between towers at 240′ and 195′. Sandy replied with his opinion that, "I mean, it looks to me, and I

---

8. The entire list of conditions is as follows:

 1–Tower shall not have lighting.

 2–Applicant and/or agent shall provide all applicable information as outlined in Tradewinds Communications report recommendations dated July 29, 2002 prior to issuance of a building permit.

 3–Tower shall be of a "monopole stealth design" where all antennae and wiring shall be mounted inside the structure.

 4–Engineering plans signed and sealed by a licensed engineer in the state of Virginia shall be submitted and approved by the Building Official prior to issuance of a building permit.

 5–Emergency services equipment shall be provided space on the structure at no cost

as discussed in public meetings concerning this request. County Attorney shall review and approve contract documents prior to the execution of the contract and the issuance of a building permit.

 6–Tower shall meet all regulations found in Section 10–48(6) of the Montgomery County Zoning Ordinance.

 7–Tower shall be setback a minimum of 100 feet from all property lines.

Exh. B13.

9. Just as with the preceding Planning Commission meeting, the record reflects the Board meeting through both the Board's minutes, Exh. B14, and the transcription of a court reporter provided by the plaintiffs, Exh. D.

am not an RF Engineer, but it looks like to me 195 provides real good coverage." *Id.* at 21:3–21:5. Marshall spoke in favor of the tower, and plaintiffs' counsel also addressed the Board.

The Board proceeded to discuss the permit request. Supervisor John Muffo indicated his opposition to the tactics of the plaintiffs:

> Well, I would just like to say that tonight, we heard what we heard [i]n the past before we had a policy.

> It was called "my way or the highway" and I don't particularly like that approach. I think the Planning Commission has gone to great lengths here to try to work with the people; to try to get something that works for every body and I think they, basically, decided they are going to yell and scream until they get what they want.

> As far as I am concerned, I am going to vote against it at the 249 level and I think—Emotionally, I feel like voting against it at any level but I will vote for it at the 199 level.

> But, I have heard 195 slash 199 level. But, you know, we heard a lot of this kind of mentality before, before we got a policy, and we heard that the roof was going to fall in and it didn't, folks. We still have communications in the country.

> But, we have heard from a lot of these folks, these people, that all hell was going to break loose if we didn't approve everything that came in here and it didn't happen and so -

> Anyway, that is enough of my speech.

*Id.* at 58:22–60:1. Supervisor Politis spoke in favor of the 240' proposal, and various board members unidentified in the transcript debated the issue back and forth. Supervisor Creed moved to approve the 240' tower, seconded by Supervisor Politis. The motion failed by a 3–4 vote. Supervisor Shorter then moved to approve the 195' tower with the restrictions recommended by the Planning Commission. Supervisor Muffo seconded the motion, and the vote was reversed, with the three who voted in favor of the 240' tower voting against the 195' tower, and the four opposed to the 240' tower voting in favor of the 195' tower.

### B. Public Opinion Evidence

Evidence of the public opinion strongly favored the erection of a wireless services tower. The plaintiffs submitted petitions signed by 95 people supporting the proposed telecommunication facility.[10] Exh. A4. The County sent notices of the proposal to the twenty owners of property adjoining Marshall's land, but no adjoining landowner testified at any of the public hearings. Eight individuals testified in favor of the proposal at the June 24 meeting of the Board, including Mr. Marshall, three other Riner-area business owners, and four members of local fire and rescue organizations. At the Planning Commission meeting on July 17, Marshall and two other individuals spoke in favor of the proposal: one was the chief of the Riner Volunteer Fire Department and the other owned a nursery in Riner. At the August 14 Planning Commission meeting, another member of the Riner Fire Department spoke in favor of the proposal. At the

---

**10.** Not all of these signatures were from Riner residents; other addresses on the petitions included Christiansburg, Blacksburg, Pulaski, Floyd, and Pilot. Christiansburg, Blacksburg, Pilot, and Riner all lie within Montgomery County. Floyd is a municipality in Floyd County, which shares a border along the southeastern side of Montgomery County. Pulaski is located in Pulaski County, which shares a border along the western edge of Montgomery County. It is reasonable to infer that people in these locations adjacent to Montgomery County would travel along the uncovered portion of Route 8.

August 26 Board of Supervisors meeting, Marshall and another Riner businessman spoke in favor of the proposal. There is no evidence that any citizen of Montgomery County (other than the members of the Planning Commission and the Board of Supervisors themselves) spoke in opposition to the proposal at any of the five public hearings on the subject. Board member Jim Politis, the supervisor from the Riner area, stated that "I have nobody in my district against it and that's where it is going." Exh. D at 18:13–14. One adjoining landowner, Lydia Millirons, did register an objection to the proposal by letter dated June 4, 2002. Ms. Millirons stated that the light would be a nuisance to her and her neighbors, would detract from the appearance of her property, and would devalue her property.

## DISCUSSION

### A. Plaintiffs' Claims

Section 704(a) of the Telecommunications Act of 1996 ("TCA") largely preserves local authority regarding the placement and construction of wireless facilities. 47 U.S.C. § 332(c)(7)(A). The TCA does limit the manner in which local governments exercise this authority by two restrictions that are relevant to this case. First, the local government's regulation of wireless facilities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." *Id.* § 332(c)(7)(B)(i)(II). Second, "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." *Id.* § 332(c)(7)(B)(iii). A challenge to the deci-

sion of a governmental body must be heard on an expedited basis. *Id.* § 332(c)(7)(B)(v). The plaintiffs allege that the defendant violated the TCA in two ways: by issuing a decision with the effect of prohibiting the provision of personal wireless services, in contravention of subsection (B)(i)(II), and by issuing a decision that was not supported by substantial evidence in a written record, in contravention of subsection (B)(iii).

Additionally, the plaintiffs assert a claim under the Virginia Code. Section 15.2–2208 provides for judicial redress of violations of the zoning code. Under Virginia law, a legislative act is unreasonable and invalid if the issue is not "fairly debatable", *City Council v. Wendy's of Western Virginia, Inc.*, 252 Va. 12, 15, 471 S.E.2d 469, 470 (1996).

### B. Cross–Motions for Summary Judgment

In this case, both parties have moved for summary judgment on all issues. Summary judgment is appropriate when the evidence demonstrates the absence of a genuine issue of material fact and the moving party's entitlement to judgment as a matter of law. Fed.R.Civ.P. 56. As I noted at oral argument, cross-motions for summary judgment produce some tension with the ordinary course of a summary judgment motion, in which I would examine the evidence and construe all reasonable inferences in favor of the non-moving party. Doing so on cross-motions for summary judgment produces the possibility that neither party is clearly entitled to prevail [11]. In this case, however, resolution of the issues on summary judgment is appropriate for two reasons. First, this

---

11. The parties declined my offer to eliminate the tension altogether and convert the sum-

mary judgment hearing into a bench trial.

case focuses on the evidence before the Board of Supervisors, and the parties do not dispute the existence of the documents and testimony involved—their only dispute is with the legal significance of the facts. Second, the TCA itself provides that these disputes shall be resolved on an expedited basis. 47 U.S.C. § 332(c)(7)(B)(v). Because of this, cross-motions for summary judgment seem to be standard practice in TCA cases. *See ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 99–100 (1st Cir.2002) (noting propriety of resolving TCA disputes on summary judgment); *see also AT & T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment*, 172 F.3d 307, 311–12 (4th Cir.1999) (noting that district court decided case on cross-motions for summary judgment); *AT & T Wireless PCS, Inc. v. City Council of City of Virginia Beach*, 155 F.3d 423, 426 (4th Cir.1998) (same). Therefore, I will resolve this case on summary judgment.

## C. Telecommunications Act Claims

### 1. Prohibiting Wireless Services

The Fourth Circuit has twice addressed the viability of a claim that the denial of a permit request constitutes a prohibition of wireless services in violation of subsection (B)(i)(II). In *Virginia Beach*, the court stated that

> any reading of subsection (B)(i)(II) that allows the subsection to apply to individual decisions would effectively nullify local authority by mandating approval of all (or nearly all) applications, a result contrary to the explicit language of section (B)(iii), which manifestly contemplates the ability of local authorities to "deny a request."

155 F.3d at 428. The court rejected the plaintiff's claim under this subsection because the plaintiff had not alleged a general ban on wireless towers. *Id.*

In *360 Communications Co. v. Bd. of Supervisors of Albemarle County*, 211 F.3d 79 (4th Cir.2000), the court again rejected a claim under subsection (B)(i)(II).[12] The court stated, "[C]ase-by-case denials of permits for particular sites cannot, without more, be construed as a denial of wireless services." *Id.* at 86 (citing *Virginia Beach*, 155 F.3d at 428–29). The court admitted the conceptual possibility that, if service could only be provided from a single site, the denial of a permit to construct a tower at that site could prohibit wireless services, but characterized that possibility as "unlikely in the real world." *Id.* at 86–87. The court also noted that the TCA does not require 100% wireless coverage and that it contemplates the existence of "dead spots" in a coverage area. *Id.* The test that the court established for a subsection (B)(i)(II) case is a formidable one: the plaintiff in such a case bears the "heavy burden" to demonstrate "not just that *this* application has been rejected, but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Id.* at 88 (quoting *Town of Amherst v. Omnipoint Communications Enters., Inc.*, 173 F.3d 9, 14 (1st Cir.1999)). The court ruled in favor of the county because 360 failed to meet its heavy burden and because the county produced rebuttal evidence that it had approved 18 wireless facility permits, including some for the plaintiff, negating the argument of fruitlessness *Id.*

In this case, the plaintiffs point out that other courts have focused on the signifi-

---

**12.** The plaintiffs question the vitality of *Albemarle County* because the three-judge panel included two District Judges sitting by designation. I have served on many such panels myself, and none of my colleagues ever indicated that the resulting decision bore less weight due to my presence.

cance of the coverage gaps that the provider seeks to fill. *See, e.g., Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus,* 197 F.3d 64, 70 (3d Cir.1999); *Omnipoint Communications MB Operations LLC v. Town of Lincoln,* 107 F.Supp.2d 108, 119 (D.Mass. 2000). The problem for the plaintiffs is that the Fourth Circuit has explicitly rejected the more provider-friendly approach of the Second and Third Circuits. *See Albemarle County,* 211 F.3d at 87 (rejecting "least intrusive means to close a significant gap in service" test and stating that "[a] community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community"). Although commentators have noted the national trend away from the Fourth Circuit's position on this issue, *see* Mitchell A. Carrel, *Railroad Tracks by Walden Pond: The Ongoing Struggle Between Towns and Providers Under the Telecommunications Act of 1996,* 33 Urb. Law. 781, 785–86 (Summer 2001); Stephanie E. Niehaus, Note, *Bridging the (Significant) Gap: To What Extent Does the Telecommunications Act of 1996 Contemplate Seamless Service,* 77 Notre Dame L.Rev. 641, 662–64 (2002), the Fourth Circuit's position is clear, and it bodes poorly for the plaintiffs.

■ I conclude that the plaintiffs have failed to meet their heavy burden on this issue. The fact that the Board did grant a special use permit for the tower, albeit not the tower the plaintiffs sought, strongly suggests that further efforts to find complementary towers would not be "fruitless." The Trade winds report stated that

additional tower sites could combine with a shorter ridge line tower to create coverage similar to the 240′ tower. On the subsection (B)(i)(II) issue, the plaintiffs bear the burden of proof, including proof that it could not locate or acquire additional tower sites or that the Board would not approve additional sites. Sandy made numerous statements before the Planning Commission and before the Board indicating that additional towers might be necessary to supplement the 195′ tower, and I do not see any evidence of opposition, such as the supervisors responding with negative comments on this possibility.[13] Simply stated, there is no evidence in the record that the Board was entrenched against all possible alternatives. *See Albemarle County,* 211 F.3d at 88 (rejecting subsection (B)(i)(II) challenge when no evidence existed in record regarding feasibility or futility of alternatives). Because the plaintiffs have not met their heavy burden on this issue, I will grant summary judgment in favor of the defendant on plaintiff's (B)(i)(II) claim.

## 2. Substantial Evidence

■ The Fourth Circuit has defined the term "substantial evidence" to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Albemarle County,* 211 F.3d at 83 (citations omitted). Substantial evidence lies on the evidentiary spectrum above a scintilla but below a preponderance. *Id.* (citation omitted). Under Virginia law, both the adoption of a zoning regulation and a governmental grant or denial of a conditional use permit are legislative actions. *Id.* (citing *County Bd. of Arlington County v. Bratic,* 237 Va. 221,

13. Supervisor Creed stated that he favored one tower as opposed to multiple towers. Exh. D at 67:4–68:4. He voted in favor of the plaintiffs' proposal, though, so his statement does not overwhelmingly suggest a general opposition to any future alternatives. At any rate, I doubt that one statement in isolation could meet the plaintiff's heavy burden to show the futility of future actions.

377 S.E.2d 368, 370 (1989); *City Council of City of Virginia Beach v. Harrell,* 236 Va. 99, 372 S.E.2d 139, 141 (1988)). As a result, the Fourth Circuit interprets reasonableness through the lens of the reasonable legislator. *Id.* (citing *Virginia Beach,* 155 F.3d at 430). I must uphold the Board's decision if it is supported by substantial evidence in the record, even if I might have reached an opposite conclusion if I were a member of the Board. *Winston–Salem,* 172 F.3d at 314 (citations omitted). The Fourth Circuit has not explicitly stated which party bears the burden of proof on this issue.[14]

The plaintiffs first catalog the evidence in favor of the 240' tower that they proposed. Such evidence includes their own engineering reports, the public opinion evidence, and the reports of the county's consultants (particularly the SCS statement that a 240' tower "is required"). The defendant objects that the amount of evidence in support of a permit proposal is irrelevant as long as substantial evidence exists in support of the Board's denial. I largely agree with the defendant, but the evidence in support of the plaintiff's proposal is important in one respect—the plaintiff's presentation of ample evidence to the Board triggered the Board's responsibility to base its decision on substantial evidence, rather than relying on the absence of evidence produced by the plaintiff. *See APT Pittsburgh Ltd. Partnership v. Lower Yoder Township,* 111 F.Supp.2d 664, 676 n. 8 (W.D.Pa.2000) (noting absurd result if government could not deny permit when plaintiff did not produce any evidence).

Next, the plaintiffs argue that the almost entirely one-sided public opinion re-

garding the 240' proposal should bind the Board to follow the voice of the people. The Fourth Circuit's cases involving the substantial evidence standard do appear to place heavy value on constituent opinion. Because the appropriate perspective is the mind of a reasonable legislator, "it is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence. These views, if widely shared, will often trump those of bureaucrats or experts in the minds of reasonable legislators." *Albemarle County,* 211 F.3d at 83 (quoting *Virginia Beach,* 155 F.3d at 430). In *Virginia Beach,* the Fourth Circuit found substantial evidence to support the city council's denial of a permit for two 135–foot towers on church property in a residential area. The court stated that the company's evidence in favor of the towers would have constituted substantial evidence, or even a preponderance, in favor of the towers, "but the repeated and widespread opposition of a majority of the citizens of Virginia Beach who voiced their views ... amounts to far more than a 'mere scintilla' of evidence to persuade a reasonable mind to oppose the legislation." 155 F.3d at 431. In *Winston–Salem,* the court determined that objections by 150 local residents, along with other evidence, amounted to substantial evidence. 172 F.3d at 315–16. In *Albemarle County,* the court noted the "virtually unanimous" citizen opposition to the proposal when twenty-three citizens testified in opposition at public hearings, forty signed a petition in opposition, and the only citizen testifying in favor of the proposal was the owner of the property who was applying for the special use permit.

---

**14.** There is a split among courts that have considered the issue. *See Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 496–97 (2d Cir.1999) (identifying split). Others have determined that the result in a particular case did not depend on the allocation of the burden. *Id.*

211 F.3d at 84. On the opposite end of the spectrum, in *Petersburg Cellular Partnership v. Bd. of Supervisors of Nottoway County*, 205 F.3d 688 (4th Cir.2000),[15] a majority of the panel determined that the citizens' concerns expressed in the case were "speculative" and not entitled to the same weight as compared to earlier decisions. "If . . . the concerns expressed by a community are objectively unreasonable, such as concerns based upon conjecture or speculation, then they lack probative value and will not amount to substantial evidence." *Id.* at 695.

 From these cases, the plaintiffs extract a "substantial evidence' continuum." The *Virginia Beach* court counseled against an interpretation of the TCA that would "thwart average, nonexpert citizens; that is, to thwart democracy." 155 F.3d at 431. The plaintiffs argue that the Board's disregard for the strong citizen support in favor of the proposal[16] means that the Board's decision to deny the proposal automatically lacks substantial evidence. I do not read the Fourth Circuit to say quite that much. The cases indicate that public sentiment, as long as it meets the "reasonably well-founded" limitation from *Notto-*

*way County*, can constitute substantial evidence. In this case, it would certainly constitute substantial evidence in favor of the plaintiffs' proposal. This public sentiment, however, does not preclude as a matter of law the co-existence of other substantial evidence against the proposal.[17] The Fourth Circuit cases do not impose the model of classical Athens or town hall New England upon wireless tower decisions across America. Indeed, if they did, I would venture that the telecommunications companies would lose far more often than win.

Having determined what is not an issue, I will now turn to the question that is the issue in a subsection (B)(iii) case—what is the evidence in support of the Board's decision? This case is somewhat unusual in that the Board did not merely deny the plaintiffs a permit outright. Instead, the Board approved a 195′ stealth monopole tower after denying the 240′ lattice tower proposed by the plaintiffs.

In my mind, then, the threshold question for this analysis is what is the difference between the 240′ tower and the 195′ tower, and what therefore made the legis-

---

**15.** The defendant asserts that the *Nottoway County* decision "is of questionable force" because it was a *per curiam* decision in which the three judges on the panel issued *seriatim* opinions. On certain issues, I agree that no majority can be gleaned from the *Nottoway County* decision. With respect to the substantial evidence issue, however, Judge King unequivocally agreed with Judge Niemeyer's analysis. *See id.* at 711 (King, J., dissenting) ("I agree fully with my colleague Judge Niemeyer that the denial of the special use permit to 360 Communications lacked substantial supporting evidence."), *see also id.* at 706 (Widener, J., concurring) (referring to Judge Niemeyer and Judge King as "the factual majority"). The portion of Judge Niemeyer's opinion concerning the substantial evidence question is therefore entitled to binding precedential weight until the Fourth Circuit says otherwise.

**16.** The defendant questions the probative value of the petitions because they stated a desire for cellular coverage in the Riner area, but did not state that the proposed tower was a lighted 240′ lattice structure. Conversely, the plaintiff argues that the visual representations of the proposal were available at each of the five public hearings on the matter, and that no citizen testified to an objection to visibility or any other feature of the proposal.

**17.** Mathematically, because substantial evidence is a lesser standard than a preponderance, which represents just over 50% certainty, it is clearly possible for substantial evidence to exist simultaneously in favor of two contradictory propositions.

lators choose the latter over the former? *Cf. ATC Realty, LLC v. Town of Kingston,* 303 F.3d 91, 95 (1st Cir.2002) (applying comparative framework to examine government's concurrent denial of plaintiff's proposal and approval of competitor's proposal). After all, the four members that voted against the 240′ tower voted in favor of the 195′ tower immediately afterward, which suggests that the relative attributes of the 195′ option were the main reason why the Board rejected the 240′ option.

Clearly the engineering data did not support or justify the Board's decision to reject the 240′ tower and approve the 195′ tower. Even aside from U.S. Cellular's data, the Board's very own consultant stated that the shorter tower would result in a 33% reduction in coverage along Route 8 and that the call quality would suffer even in areas with coverage.[18] The only "evidence" that the two towers were even roughly equivalent from an engineering standpoint was Sandy's opinion based on his view of the propagation maps, and he qualified his opinion in the same phrase by admitting that he lacked the background to make that judgment. There was no evidence to support the 195′ tower as being superior to the 240′ tower from an engineering standpoint.

It follows, then, that the Board had other concerns in mind that counteracted the engineering data to make the 195′ tower a preferable decision to the 240′ tower. The differences are simple and obvious: as recited by the board chairman, Mary Biggs, prior to the vote on the 240' tower, "[T]hat is how this proposal would differ from the one that is in our agenda packet in those three ways; height, the lighting, and the type [i.e. lattice vs. stealth monopole]." Exh. D at 87:23–88:2. Supervisor Annette Perkins similarly observed that "the issue is not whether we are going to have a tower or not; right? What we have been sitting here talking about is how high is it going to be." *Id.* at 86:7–11. After the motion for the plaintiffs' proposal failed, Biggs again noted, "I think there is agreement that there is going to be a tower and I think the disagreement was the height." *Id.* at 91:12–14.

In the phrase repeatedly used by members of the planning staff, the Planning Commission, the Board, and the defendant's counsel on brief, the 195' tower was less "visually intrusive." Sandy's July 31 memorandum outlined the relative visibility of the two towers, due to the height, the requirement that the taller tower be lit, and the ability of the 195' tower to be of a monopole design. Sandy's statements at the August 14 and August 26 hearings confirmed this focus. At the August 26 hearing before the Board, Sandy stated that the Planning Commission recommended the 195' tower because "having a light on it in a rural part of the county would be visually intrusive." He also stated that the requirement of a stealth monopole rather than lattice design "gets back to the visually intrusive aspect of the Comprehensive Plan." Supervisor Politis recognized this as the core of the opposition to the 240' tower, which he supported: "I am more concerned with the safety aspect than I am with the aesthetic aspect." Exh. D at 60:7–9. Another supervisor stated that "the 199 is, really, like I said, just to avoid lighting...." *Id.* at 64:15–16. Supervisor Shorter opined that locating a

---

**18.** Counsel for the plaintiffs also indicated at oral argument that no propagation study ever considered the additional coverage effect of a stealth monopole, which according to counsel results in an additional 16% decrease in coverage due to the internal rather than external mounting of the antennae. I could not find any evidence in the record to support counsel's representation on this point, though.

lit tower on a ridgeline "messes up the whole holler." *Id.* at 69:15–16.

■ The problem is that this is a judgment on aesthetics, which under settled Virginia law is not a valid basis by itself for a zoning decision.[19] *See Bd. of Supervisors of James City County v. Rowe,* 216 Va. 128, 145, 216 S.E.2d 199, 213 (1975) ("[A] county cannot limit or restrict the use which a person may make of his property under the guise of its police power where the exercise of such power would be justified solely on aesthetic considerations." While the fact that aesthetic considerations entered into the reasons for passage of an ordinance will not invalidate it, it is valid only if "other elements within the scope of the police power are present." (quoting *Kenyon Peck, Inc. v. Kennedy,* 210 Va. 60, 64, 168 S.E.2d 117, 120–21 (1969))).[20] Reference to the law of the Commonwealth is appropriate because the TCA, other than the enumerated exceptions, does not "limit or affect the authority of a State or local government." 47 U.S.C. § 332(c)(7)(A). Notably, then, by not "affecting" state law, it does not augment the Board's authority either—the TCA preserves only such power as the Board has in the absence of the TCA. *Cf. Winston–Salem,* 172 F.3d at 315 n. 4 (referring to relevant state law when examining substantial evidence). Other federal courts in Virginia have noted the applicability of *Rowe* to permit denials under the TCA. *See Virginia Metronet, Inc. v. Bd. of*

*Supervisors of James City County,* 984 F.Supp. 966, 974 (E.D.Va.1998); *AT&T Wireless PCS, Inc. v. City Council of City of Virginia Beach,* 979 F.Supp. 416, 428 n. 18 (E.D.Va.1997), *rev'd on other grounds,* 155 F.3d 423.

To be sure, the Fourth Circuit has discussed aesthetic considerations in its three cases holding that substantial evidence existed in support of a government's denial of a special use permit for a wireless telecommunications facility. In each of these cases, though, there was some concern in addition to aesthetic considerations. First, in *Winston–Salem,* a case in which the local government was not subject to the restrictions of Virginia law any way, evidence existed regarding the impact of the tower on the historical value of a house eligible for listing in the National Register, as well as testimony from a mortgage banker regarding the negative impact the tower would have on the resale value of nearby homes. 172 F.3d at 315–16. In *Albemarle County,* the court cited the testimony of local citizens regarding the tower's incompatibility with environmental preservation goals, including erosion control. 211 F.3d at 82, 84. In *Virginia Beach,* objections to the proposal admittedly seemed to focus on aesthetic considerations. At the very least, though, the local government there had "repeated and widespread opposition" from citizens on which to base its decision. 155 F.3d at 423.[21]

---

**19.** The term "aesthetic" is defined as "[r]elating to that which is beautiful or in good taste." Black's Law Dictionary 57 (6th ed.1990).

**20.** Although the *Rowe* decision speaks of the passage of a zoning ordinance, Virginia law considers the denial of a special use permit to be a legislative act as well *Albemarle County,* 211 F.3d at 83 (citations omitted); *see also City Council of Virginia Beach v. Harrell,* 236 Va. 99, 102, 372 S.E.2d 139, 141 (1988) ("The

standards of judicial review applicable to zoning enactments also apply to actions taken by a local governing body on an application for a conditional use permit."). I see no reason why *Rowe* would not apply to all legislative acts that implicate zoning issues.

**21.** In neither of its two TCA cases from Virginia did the Fourth Circuit reject or even comment on *Rowe.* As I stated above, *Rowe* is a clear limit on the authority of a locality in

In contrast to the above cases, the evidence before the Board in this case lacked the "something more" that would combine with aesthetic considerations to rise to the level of substantial evidence. The only citizen opposition to the plaintiffs' proposal, the Millirons letter, recited objections based on aesthetics and based on a fear that her property values might decline. Unlike in *Winston–Salem,* however, the Board here had no evidence that property values would actually be threatened. There was similarly no evidence of any environmental threat posed by the 240' tower. Furthermore, and most importantly, there was no evidence that the 195' tower would have any less of an impact on the environment, property values, or any other non-aesthetic consideration. As stated repeatedly by Montgomery County officials, the 195' tower was preferable because it was less "visually intrusive." In other words, it looked better. I doubt that anyone would argue that any of the potential tower designs was attractive in an absolute sense *see Southwestern Bell Mobile Sys., Inc. v. Todd,* 244 F.3d 51, 61 (1st Cir.2001) ("Few people would argue that telecommunication towers are aesthetically pleasing."); Timothy J. Tryniecki, *Cellular Tower Siting Jurisprudence Under the Telecommunications Act of 1996—The First Five Years,* 37 Real Prop. Prob. & Tr. J. 271, 282 (Summer 2002) ("[V]irtually no one would argue that even the best cellular tower is aesthetically positive."), but it is not my place to judge which tower design is, relatively speaking, more aesth-

etically pleasing.[22] Given the clear dictates of the Supreme Court of Virginia in *Rowe,* though, it is not Montgomery County's place to do so either without additional non-aesthetic factors in support. *See Virginia Metronet,* 984 F.Supp. at 974–75 (applying *Rowe* and determining that city council's decision was based on impermissible aesthetic grounds).

Phrased in the terminology of the Fourth Circuit, then, I conclude that a reasonable legislator would not have reached the decision of the Board in this case because a reasonable legislator would not base his or her decision on a justification that, standing alone, is insufficient under Virginia law. Even under the most deferential standard of *Virginia Beach,* in which "widespread" citizen opposition based on aesthetic concerns constituted substantial evidence, here the (one) citizen opposition is not enough to bolster the Board's own judgment on the relative attractiveness of the two tower designs. The Board's decision is not supported by substantial evidence in a written record, and therefore the plaintiffs are entitled to summary judgment on this issue.

### 3. Tenth Amendment Challenge

Because I have ruled against the defendant on the substantial evidence issue, I must now address the Board's argument that Section 704(a) of the TCA violates the Tenth Amendment. No federal court has found this section of the TCA unconstitutional on this basis.[23] The Fourth Circuit

---

Virginia, and the TCA does nothing to remove that limit.

**22.** It is fortunate that this is not my task because I fear that trying to judge relative levels of beauty in tower designs would prove to be much like trying to judge relative levels of chastity inside a bordello.

**23.** I have found only one case that reached an explicit holding on the issue, and there the

court upheld the constitutionality of subsection (B)(iii). *See SBA Communications, Inc. v. Zoning Commission of Town of Franklin,* 164 F.Supp.2d 280, 289 (D.Conn.2001) (ruling that substantial evidence requirement did not offend Tenth Amendment). Courts have similarly affirmed the constitutionality of subsection (B)(iv), which outlaws any tower denial based on concerns about radio wave emissions. *See Cellular Phone Taskforce v. F.C.C.,*

has recognized the issue, but has never reached a binding decision. In *Virginia Beach*, the court declined to reach the constitutional issue because the statutory analysis resolved the case. 155 F.3d at 431 n. 7. In *Nottoway County*, Judge Niemeyer and Judge King registered opposing views on the issue, and Judge Widener arrived at his opinion on an entirely statutory basis. *See Nottoway County*, 205 F.3d at 705 (opinion of Niemeyer, J.) (determining that subsection (B)(iii) violates Tenth Amendment); *id.* at 710 (Widener, J., concurring) (declining to reach constitutional issue); *id.* at 720 (King, J., dissenting) (rejecting constitutional challenge).

The parties have not exerted themselves in debating this issue. The defendant essentially adopts Judge Niemeyer's argument by reference in a single paragraph, and the plaintiffs respond with their own paragraph adopting Judge King's argument by reference. This leaves me in the awkward position of officiating an interpretational dispute between two judges who sit on a court of review above me. Nevertheless, the defendant has raised the issue as a defense and I must consider it.

▮ A statute passed pursuant to Congress's Commerce Clause authority is presumed to be constitutional. *Marshall v. Rose*, 616 F.2d 102, 104 (4th Cir.1980). Although the defendant's argument is sparse, I do not read the defendant to assert the untenable argument that wireless telecommunications is a subject outside the purview of Congress's power under the Commerce Clause. The defendant's constitutional claim is that, by forcing state and local authorities to

comply with the standards enumerated in § 332(c)(7), Congress has impermissibly commandeered state machinery for execution of a federal program under the logic of *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). In each of those cases, however, the challenged statutes affirmatively required action on the part of the state officials: in *Printz*, the chief local law enforcement officer had to perform an investigation into the background of every gun purchaser, and in *New York*, states had to choose between actively regulating according to federal standards or taking title to radioactive waste. In the case of subsection (B)(iii), and indeed in all of § 322(c)(7), by contrast, Congress has not affirmatively mandated that the state or local government take any action.[24] Instead, Congress has required that, if (and only if) a state chooses to regulate in this field in which Congress could preempt the state entirely, the state must comply with certain procedural and substantive guidelines. This choice is entirely permissible under the Constitution. *See New York*, 505 U.S at 167, 112 S.Ct. 2408 ("[W]here Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation."); *Nottoway County*, 205 F.3d at 716 (King, J., dissenting)(reviewing Supreme Court's affirmation of conditional preemption doctrine); *Cellular Phone Taskforce*, 205

205 F.3d 82, 96 (1st Cir.2000) (rejecting Tenth Amendment challenge).

**24.** Indeed, due to the preservation of local authority in § 322(c)(7)(A), the local government is administering a program almost entirely of its own creation rather than a purely federal program.

F.3d at 96 (holding that subsection (B)(iv) of TCA did not violate Tenth Amendment because states not affirmatively required to do anything).

It is completely irrelevant that land use decisions are an important and traditionally local matter. "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (discussing preemption of real property law). Indeed, as Judge King noted in *Nottoway County,* the irony in the defendant's claim is that, rather than accepting the wide latitude for local authorities that Congress preserved in § 322(c)(7)(a), the defendant would insist that Congress preempt the field entirely and not permit the local government to regulate tower siting at all. 205 F.3d at 711 (King, J., dissenting).

Because the requirements of subsection (B)(iii) are a pure exercise of Congress's authority under the Commerce Clause, and because in any event the defendant has not met its burden of demonstrating the unconstitutionality of this provision, I reject the defendant's Tenth Amendment challenge.

## D. Virginia Law Claim

■ As an alternative count, the plaintiffs claim that the Board's actions were arbitrary and unreasonable in violation of Virginia law. The plaintiffs assert this claim under Va.Code § 15.2–2208 (Michie 1997), which provides: "Any violation or attempted violation of this chapter, or of any regulation adopted hereunder may be restrained, corrected, or abated as the case may be by injunction or other appropriate proceeding." I have found only one case invoking this section, and in that case the court held that § 15.2–2208 does not create any private right of action, but rather is a vehicle for local authorities to enforce their own zoning laws. *Fields v. Elkins,* 52 Va. Cir. 206, 2000 WL 33258778 (May 2, 2000). Therefore, the plaintiffs cannot assert a claim under this section.

■ From the cases cited by both sides, however, it is clear that the Virginia courts are open to entertain challenges to zoning decisions by municipal authorities, usually through a declaratory judgment action.[25] *See Bratic,* 237 Va. at 222, 377 S.E.2d at 368 (noting that landowner proceeded by filing motion for declaratory judgment); *City of Richmond v. Randall,* 215 Va. 506, 507, 211 S.E.2d 56, 57 (1975) (same). In such a case, the Board's action is presumptively reasonable, and the plaintiff attacking the act bears the burden of establishing unreasonableness. *City Council for the City of Salem v. Wendy's of Western Virginia, Inc.,* 252 Va. 12, 14–15, 471 S.E.2d 469, 470 (1996). The Supreme Court of Virginia has outlined a test for determining reasonableness:

> Legislative action is reasonable if the matter in issue is fairly debatable. An issue is fairly debatable if, when measured by quantitative and qualitative tests, the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions.

---

25. The defendant argues that it would be appropriate for me to abstain from deciding the state-law claim under the doctrine of *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), because this claim involves a matter of substantial importance to the state, namely land use. It would be ironic for me to abstain from adjudicating this claim when I must decide the plaintiffs' other claims under the TCA, which impacts local land use just as much as the state-law claim.

*Id.* at 15, 471 S.E.2d at 470–71 (citing *Bd. of Supervisors of Fairfax County v. Pyles,* 224 Va. 629, 637–38, 300 S.E.2d 79, 84 (1983)).

The defendant argues that this standard is even more deferential to the government than is the substantial evidence standard under the TCA. I am not convinced that there is any meaningful difference between the two, other than the fact that Virginia law clearly allocates the burden to the plaintiff where as the burden is unsettled under the TCA. Regardless, under both the "fairly debatable" standard and the substantial evidence standard, the government wins the benefit of the doubt when there is evidence in support of each party's position.

 If the standards are substantially the same, then so is the resultant analysis. The plaintiffs produced evidence of the propriety of the 240' tower from an engineering standpoint and produced strong public support for the tower from numerous citizens. The defendant denied the plaintiffs' proposal and substituted its own proposal to achieve aesthetic goals. Under *Rowe,* a decision rendered purely on aesthetic grounds is invalid in Virginia. Therefore, the Board's decision based on an impermissible reason was unreasonable. *See Bd. of County Supervisors of Fairfax County v. Davis,* 200 Va. 316, 322, 106 S.E.2d 152, 157 (1958) (holding that county's denial of rezoning request was unreasonable because county based decision on impermissible factor, economic protectionism). I therefore grant the plaintiffs' motion for summary judgment on the claim under Virginia law.

### E. Remedy

The TCA does not specify a remedy for violations of § 322(c)(7)(B). The issue is unsettled in the Fourth Circuit because no Fourth Circuit panel has ever ruled in favor of a plaintiff in a TCA case, and therefore the remedy issue has always been moot. The *Winston–Salem* court did indicate that a writ of mandamus was inappropriate. *See Winston–Salem,* 172 F.3d at 312 n. 3 (noting that federal mandamus statute does not apply to state officials). Additionally, the court opined that, because subsection (B)(v) granted jurisdiction to the district court, "that statute is bound to imply that the district court may issue appropriate orders to dispose of the merits of the case." *Id.*

In *Virginia Metronet,* which to date is the only published district court decision under the TCA within the Fourth Circuit that has not been reversed on appeal, the court granted the plaintiff a mandatory injunction ordering the local government to approve the plaintiff's permit request. 984 F.Supp. at 977. The growing consensus of courts around the country is that a mandatory injunctive order directing the government to approve the permit is appropriate. *See, e.g., New Par v. City of Saginaw,* 301 F.3d 390, 399–400 (6th Cir. 2002) (granting injunctive relief and citing cases); *Preferred Sites, LLC v. Troup County,* 296 F.3d 1210, 1221–22 & n. 12 (11th Cir.2002) (same); *SBA Communications,* 164 F.Supp.2d at 294 (same). The common factor identified by these courts is that the TCA contemplates a relatively swift process: under subsection (B)(ii), local governments must act on a request within a "reasonable time," and under subsection (B)(v), the district court must hear the case on an "expedited basis". These provisions suggest that "Congress did not intend multiple rounds of decisions and litigation, in which a court rejects one reason and then gives the board the opportunity, if it chooses, to proffer another." *National Tower, LLC v. Plainville Zoning Bd. of Appeals,* 297 F.3d 14, 21 (1st Cir. 2002). In addition, the utility of remanding the case to the Board for further proceedings is dubious because the Board has already had one opportunity to reach a

decision based on the written record, which was already complete and closed when the Board voted the first time. *See Brehmer v. Planning Bd. of Town of Wellfleet*, 238 F.3d 117, 121 (1st Cir.2001) ("Because all relevant evidence was adduced at the initial hearing ... a remand to the Planning Board would serve no useful purpose.").

▆▆▆ Therefore, to avoid further delay in the resolution of this issue contrary to the will of Congress, I will grant the plaintiffs' request for injunctive relief.[26] Accordingly, the defendant's denial of the plaintiffs' special use permit is declared to be null and void. The defendant shall grant the plaintiffs' requested special use permit with all deliberate speed, and in any event no later than 30 days from the entry of this opinion and the accompanying order. Of course, this is not a blank check for the plaintiffs—they still must comply with all applicable state laws and Montgomery County ordinances from which they did not specifically request exception.

## CONCLUSION

For the reasons stated above, the defendant has failed to issue a decision based on substantial evidence in a written record, in violation of 47 U.S.C. § 322(c)(7)(B)(iii). An appropriate order shall this day issue.

## *ORDER*

Before me are cross-motions for summary judgment by the plaintiffs and the defendant [Nos. 5–1, 9–1]. For the reasons stated in the accompanying memorandum opinion, the plaintiffs' motion is **GRANTED IN PART** and **DENIED IN PART** and the defendant's motion is

**GRANTED IN PART** and **DENIED IN PART**. I hereby **DECLARE** that the defendant stands in violation of 47 U.S.C. § 332(c)(7)(B)(iii), and that the defendant's denial of the plaintiffs' requested special use permit is null and void. I therefore **ORDER** the defendant to approve the special use permit request of the plaintiffs to construct a 240' telecommunication tower of lattice structure with 9' lightning rod on Tax Parcel No. 138–A–51 in the Riner Magisterial District within 30 days of the entry of this order. The plaintiffs must still comply with any and all state and local laws excluding those from which they requested an exception.

Any other pending motions are dismissed is moot. The Clerk is directed to strike this case from the active docket. The Clerk shall send a copy of this order and memorandum opinion to counsel of record.

▆▆▆▆▆▆▆▆▆▆▆▆

---

26. The remedial question makes the plaintiffs' victory on the Virginia-law claim comparatively hollow—under Virginia law, a court has no power to order a legislative body to approve a particular zoning request. *Randall*, 215 Va. at 513, 211 S.E.2d at 61 (citing *Bd. of*

*Supervisors v. Altman*, 215 Va. 434, 445, 211 S.E.2d 48, 55 (1975)). This does not affect the authority of a district court to issue an order pursuant to its jurisdiction conferred by the TCA.